**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

---

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL ACTION NO. 20-2910 |
| | ) | |
| Plaintiff, | ) | SECTION: |
| | ) | |
| v. | ) | JUDGE: |
| | ) | |
| TAYLOR ENERGY COMPANY LLC, | ) | MAGISTRATE JUDGE: |
| | ) | |
| Defendant. | ) | |

---

## COMPLAINT

The United States of America, acting at the request of the United States Coast Guard, files this Complaint and alleges as follows:

### NATURE OF THE ACTION

1. This civil action arises from an oil spill that began on or about September 16, 2004, when Hurricane Ivan passed through the Gulf of Mexico and an offshore oil production platform approximately ten miles off the coast of Louisiana on the Outer Continental Shelf collapsed and sank. The platform, related wells, and other equipment were owned and operated by Defendant Taylor Energy Company LLC ("Defendant") and located on a tract of land known as Mississippi Canyon Block 20 or "MC-20" leased by Defendant from the U.S. Department of the Interior.

2. Oil has continued to flow into the Gulf of Mexico from the related oil wells. Since April 2019, the United States Coast Guard ("Coast Guard") has been collecting and removing oil using a containment system designed and installed after the Coast Guard partially federalized the oil spill response action.

3. The United States seeks repayment from Defendant as a responsible party under

1

Sections 1002(a) and 1005 of the Oil Pollution Act ("OPA"), 33 U.S.C. §§ 2702(a) and 2705, of over $43 million in removal costs and interest incurred by the Oil Spill Liability Trust Fund (the "Fund") in response to this incident or incidents. Defendant is a responsible party under OPA Section 1001(32)(C), 33 U.S.C. § 2701(32)(C), as a lessee and/or permittee of the MC-20 Facility, an offshore facility.

4.      The United States further seeks repayment pursuant to OPA Sections 1004(c)(3) and 1005, 33 U.S.C. §§ 2704(c)(3) and 2705, from Defendant, as an owner or operator of an Outer Continental Shelf facility of these same removal costs paid by the Fund and interest accrued on such costs.

5.      The United States seeks a declaratory judgment on liability for removal costs and damages against Defendant, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), and OPA Sections 1002(a), 1004(c)(3), 1005, and 1017(f)(2), 33 U.S.C. §§ 2702(a), 2704(c)(3), 2705, and 2717(f)(2), that is binding in this action and any subsequent action or actions against Defendant, for all removal costs, damages, and interest in any subsequent action or actions.

6.      The United States seeks civil penalties, under Section 311(b)(7) of the Clean Water Act ("CWA"), 33 U.S.C. § 1321(b)(7), against Defendant of up to $48,192 per day of violation or $1,928 per barrel of oil that has been discharged; or at least $192,768 or up to $5,783 per barrel of oil that has been discharged, to the extent that the discharge of oil was the result of gross negligence or willful misconduct by Defendant.

7.      The United States seeks a declaratory judgement, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201(a), and Section 311(f) of the Clean Water Act, 33 U.S.C. § 1321(f), for costs or expenses incurred by the United States in the restoration or replacement of natural resources damaged or destroyed as a result of the discharge of oil or a hazardous

2

substance in violation of Section 311(b) of the CWA, 33 U.S.C. § 1321(b).

## I.     JURISDICTION AND VENUE

8.     This Court has jurisdiction over the subject matter of this action and over the

parties pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1345 (United States as

plaintiff), 28 U.S.C. § 1355 (fine, penalty), 33 U.S.C. § 2717(b) (OPA) and 33 U.S.C.

§ 1321(b)(7)(E) (CWA).

9.     Authority to bring this action is vested in the United States Department of Justice

by, *inter alia*, 28 U.S.C. §§ 516 and 519.

10.     Venue in this District is proper pursuant to Section 1017(b) of OPA, 33 U.S.C.

§ 2717(b); Section 311(b)(7)(E) of the CWA, 33 U.S.C. § 1321(b)(7)(E); and 28 U.S.C.

§§ 1391 and 1395, because it is the judicial district in which Defendant is located.

## II.     THE DEFENDANT

11.     Defendant Taylor Energy Company LLC is a Louisiana limited liability company

with its principal place of business in New Orleans, Louisiana.

## III.     STATUTORY AND REGULATORY BACKGROUND

### A. Responsible Party Liability for Removal Costs and Damages under the OPA

12.     OPA Section 1002(a), 33 U.S.C. § 2702(a), provides that "each responsible party

for . . . a facility from which oil is discharged, or which poses the substantial threat of a

discharge of oil, into or upon the navigable waters or adjoining shorelines . . . is liable for the

removal costs and damages specified in subsection (b) [33 U.S.C. § 2702(b)] that result from

such incident."

13.     "Facility" means "any structure, group of structures, equipment, or device (other

than a vessel) which is used for one or more of the following purposes: exploring for, drilling

for, producing, storing, handling, transferring, processing, or transporting oil." 33 U.S.C. § 2701(9).

14.     OPA Section 1001(32)(C), 33 U.S.C. § 2701(32)(C), defines "responsible party" to include, "[i]n the case of an offshore facility . . . the lessee or permittee of the area in which the facility is located . . . [.]"

15.     OPA Section 1001(30), 33 U.S.C. § 2701(30), defines "remove" and "removal" to mean "containment and removal of oil or a hazardous substance from water and shorelines or the taking of other actions as may be necessary to minimize or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches[.]"

16.     OPA Section 1001(31), 33 U.S.C. § 2701(31), defines "removal costs" to mean "the costs of removal that are incurred after a discharge of oil has occurred or, in any case in which there is a substantial threat of a discharge of oil, the costs to prevent, minimize, or mitigate oil pollution from such an incident[.]"

17.     OPA Section 1002(b)(1)(A), 33 U.S.C. § 2702(b)(1)(A), provides that the "removal costs" referred to in Section 1002(a) of OPA, 33 U.S.C. § 2702(a), include "all removal costs incurred by the United States . . . under subsection (c), (d), (e), or (l) of Section 1321 of this title [Section 311 of the Clean Water Act, 33 U.S.C. § 1321]."

18.     Pursuant to OPA Section 1017(f)(2), 33 U.S.C. § 2717(f)(2), in any action for recovery of removal costs referred to in OPA Section 1002(b)(1), 33 U.S.C. § 2702(b)(1), "the court shall enter a declaratory judgment on liability for removal costs or damages that will be binding on any subsequent action or actions to recover further removal costs or damages."

19.     OPA Section 1002(b)(2), 33 U.S.C. § 2702(b)(2), provides that the "damages"

4

referred to in OPA Section 1002(a), 33 U.S.C. § 2702(a), include damages for injury to, destruction of, or loss of use of, natural resources; damages for loss of subsistence use of natural resources; damages for injury to real or personal property, loss of profits and earning capacity; and damages equal to the net loss of taxes, royalties, rents, fees, or net profit shares.

20.     OPA Section 1001(20), 33 U.S.C. § 2701(20), provides that "'natural resources' includes land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the exclusive economic zone), any State or local government or Indian tribe, or any foreign government."

21.     OPA Section 1005, 33 U.S.C. § 2705, provides that each responsible party is liable to the United States for interest on the removal costs, and such interest begins to accrue on the 30th day following the date on which the claim is presented to the responsible party.

## B. Outer Continental Shelf Facility Owner/Operator Liability for United States Removal Costs under the OPA

22.     OPA Section 1004(c)(3), 33 U.S.C. § 2704(c)(3), provides, "Notwithstanding the limitations established under subsection (a) of this section [33 U.S.C. § 2704(a)] and the defenses of section 2703 of this title, all removal costs incurred by the United States Government or any State or local official or agency in connection with a discharge or substantial threat of a discharge of oil from any Outer Continental Shelf facility or a vessel carrying oil as cargo from such a facility shall be borne by the owner or operator of such facility or vessel."

23.     OPA Section 1001(25), 33 U.S.C. § 2701(25), defines "Outer Continental Shelf facility" to mean "an offshore facility which is located, in whole or in part, on the Outer Continental Shelf and is or was used for one or more of the following purposes: exploring for, drilling for, producing, storing, handling, transferring, processing, or transporting oil produced

5

from the Outer Continental Shelf[.]"

*C. Liability for Penalties and Restoration Costs under the CWA*

24.    Section 311(b) of the CWA, 33 U.S.C. § 1321(b), prohibits the discharge of oil or hazardous substances into or upon the navigable waters of the United States or adjoining shorelines in such quantities as the President determines may be harmful to the public health or welfare or environment of the United States.

25.    Pursuant to Section 311(b)(4) of the CWA, 33 U.S.C. § 132l(b)(4), the United States Environmental Protection Agency ("EPA"), acting through its delegated authority under Executive Order No. 11,735, 38 Fed. Reg. 21,243 (Aug. 7, 1973), has determined by regulation that discharges of oil in such quantities as may be harmful to the public health or welfare or environment of the United States include discharges of oil that "(a) Violate applicable water quality standards; or (b) Cause a film or sheen upon or discoloration of the surface of the water or adjoining shorelines or cause a sludge or emulsion to be deposited beneath the surface of the water or upon adjoining shorelines." 40 C.F.R. § 110.3.

26.    CWA Section 311(b)(7)(A), 33 U.S.C. § 1321(b)(7)(A), provides that any person who is the owner, operator, or person in charge of an offshore facility from which oil is discharged in violation of Section 311(b)(3) of the CWA shall be subject to a civil penalty.

27.    Pursuant to CWA Section 311(b)(7)(A), 33 U.S.C. § 1321(b)(7)(A), and the Department of Homeland Security's 2020 Civil Monetary Penalty Adjustment For Inflation Rule, 85 Fed. Reg. 36469 (June 17, 2020), each violation of Section 311(b)(3) of the CWA occurring after December 6, 2013, through November 2, 2015, is subject to a civil penalty of up to $37,500 per day of violation or up to $2,100 per barrel of oil discharged, and each violation of Section 311(b)(3) of the CWA occurring after November 2, 2015, is subject to a civil penalty of

6

up to $48,192 per day or up to $1,928 per barrel of oil discharged. 33 C.F.R. § 27.3.

28.     Pursuant to CWA Section 311(b)(7)(D), 33 U.S.C. § 1321(b)(7)(D), and EPA's

2020 Civil Monetary Penalty Inflation Adjustment Rule, 85 Fed. Reg. 1751 (Jan. 13, 2020),

where the violation of Section 311(b)(3) of the CWA is the result of gross negligence or willful

misconduct, the owner, operator, or person in charge is subject to a civil penalty of at least

$150,000 or $5,300 per barrel for violations that occurred after December 6, 2013 through

November 2, 2015, and at least $192,768 or up to $5,783 per barrel for violations that occurred

after November 2, 2015. 33 C.F.R. § 27.3.

29.     Pursuant to CWA Sections 311(f)(4) and (5), 33 U.S.C. § 1321(f)(4) and (5), the

owner or operator of a vessel or onshore or offshore facility is liable for costs or expenses

incurred by the United States in the restoration or replacement of natural resources damaged or

destroyed as a result of the discharge of oil or a hazardous substance in violation of Section

311(b) of the CWA, 33 U.S.C. § 1321(b).

## IV.     **FACTUAL ALLEGATIONS**

### A.     *History of the MC-20 Facility*

30.     In 1981, Sohio Petroleum Corporation ("Sohio") purchased an oil and gas lease,

OCS-G 04935, located on the Outer Continental Shelf in the Gulf of Mexico. The OCS-G 04935

Lease granted Sohio the exclusive right and privilege to drill for, develop, and produce oil and

gas resources in the submerged lands known as Block 20 of the Mississippi Canyon, referred to

herein as the "MC-20 Block."

31.     Lease OCS-G 04935 identified portions of the MC-20 Block that were subject to

mass movements of sediment and required Sohio to conduct site-specific surveys and mapping to

determine the potential for unstable bottom conditions.

32.     Sohio hired Woodward-Clyde Oceaneering ("Woodward") to perform geologic studies of the MC-20 Block to determine the characteristics of seafloor instability features of the region and to gauge the potential for mass sediment movements within the MC-20 Block.

33.     After concluding its study, Woodward proposed a site for the construction of an oil production platform within the MC-20 Block immediately downslope of an area with large mudflow deposits from the Mississippi River.

34.     In an effort to monitor mass soil movements upslope of the proposed site, Woodward recommended a program of periodic geophysical surveys around and upslope from the platform site utilizing the same geophysical tools and following the same track lines as used in the 1982 survey for the purpose of monitoring seafloor instabilities and sediment accumulations.

35.     Woodward also recommended biennial geophysical surveys and surveys following any major storms of the mudflow channels and depositional lobes above the proposed site to monitor seafloor instabilities.

36.     On August 8, 1983, Sohio submitted its Initial Plan for the Development and Production of Lease OCS-G 04935 to the Department of Interior Mineral Management Service ("MMS") for review.

37.     MMS approved Sohio's plan for the construction of the oil production platform, the drilling of wells A1 – A28, and oil pipelines that served as tie-in points with other platforms within the Gulf for the transport of oil.

38.     MMS approval was granted pursuant to 30 C.F.R. § 250.34 with the stipulation that high resolution geophysical surveys be conducted to monitor the seafloor conditions in MC-20 Block prior to platform installation and every two years thereafter. In addition, the

geophysical seafloor surveys were required to be conducted after any major storms in the area.

39.     In August 1984, Sohio completed construction of the oil production platform with 28 well slots. The platform is referred to hereafter as the "MC-20A Platform" or the "Platform."

40.     Sohio drilled 18 wells (A-1 through A-18) to develop and produce oil and gas. All of those wells were completed, except A-5 and A-15, which were plugged, and temporarily abandoned.

41.     BP Exploration and Oil, Inc. acquired Sohio in 1987 and operated the MC-20A Platform and oil well field until it sold the Platform, connecting oil wells, and the OCS-G 04935 Lease to Defendant in 1994.

42.     Defendant continued the operation of the MC-20A Platform and drilled ten additional wells (A-19 through A-28) in 2000. The Platform, the related wells, and all related equipment, all located within the MC-20 Block, are collectively referred to herein as the "MC-20 Facility" or the "Facility."

43.     From 1994 to 2004, Defendant failed to conduct geophysical surveys of the MC-20 Block seafloor every two years and after major storms, as recommended by Woodward and required by MMS as part of Lease OCS-G 04935, except for a 2001 survey of Block 21 of the Mississippi Canyon that Defendant alleges also partially surveyed the MC-20 Block.

### B.     The MC-20 Oil Discharge

44.     Defendant continued to operate and produce oil and gas from the MC-20 Facility until the Platform was toppled, related wells and equipment were damaged, and oil production was halted when Hurricane Ivan passed through the Gulf of Mexico in September 2004.

45.     On or about September 16, 2004, the MC-20 Facility began discharging oil into the Gulf of Mexico (the "MC-20 Oil Discharge").

46.     On September 17, 2004 the first MC-20 sheen report was made to the National Response Center following the loss of the MC-20A Platform.

47.     From 2004 to 2007, the MC-20 Facility and surrounding area were monitored by overflights, surveys were conducted, and response options were evaluated.

48.     In 2008, a Unified Command was established to, *inter alia*, oversee and coordinate all response and mitigation efforts related to the MC-20 Oil Discharge. The Unified Command included the Coast Guard as the Federal On-Scene Coordinator ("FOSC"), MMS (now the Bureau of Safety and Environmental Enforcement ("BSEE") and the Bureau of Ocean Energy Management ("BOEM")), and Defendant.

49.     On September 23, 2008, the Coast Guard FOSC issued Administrative Order (Admin Order) 006-08, which required Defendant to address the ongoing discharge of oil from the MC-20 Facility by, *inter alia*, deploying an open water skimmer to mitigate the continuous discharge at the Facility until such time that pollution domes were installed; conducting overflights twice daily to monitor the discharge from the Facility; providing Coast Guard the results of the overflights; and installing pollution domes to mitigate the continuous discharge no later than November 1, 2008.

50.     In May 2009, Defendant deployed a subsea oil recovery system at the MC-20 Facility.

51.     From 2009 to 2012, Defendant's subsea containment system deteriorated and oil continued to discharge from the MC-20 Facility.

52.     On June 25, 2012, the FOSC issued Admin Order 12-001, which required, *inter alia*, that Defendant begin the design and planning for a new pollution dome system suitable for the environmental conditions at the MC-20 Block and submit a written plan that showed a

10

projected timeline for fabrication and installation to the Unified Command no later than September 1, 2012.

53.     On November 26, 2012, the FOSC amended Admin Order 12-001 to allow Defendant to make repairs to its containment domes as an interim step in meeting the requirements of Admin Order 12-001. Defendant was given until January 30, 2013 to identify two companies that could design a new pollution dome system or make recommendations for the proper repair to its current system.

54.     On October 23, 2018, the Coast Guard issued Admin Order 19-001 to Defendant, ordering it, *inter alia*, to institute a new containment system to capture, contain, and remove oil discharged from the MC-20 Facility.

55.     In November 2018, Defendant presented three new containment domes to the Unified Command as a proposal to contain the ongoing MC-20 Oil Discharge and as a replacement for its failed subsea containment system.

56.     The Unified Command rejected Defendant's proposal because it concluded, *inter alia*, that the proposed domes would result in increased bottom disturbances; have limited storage capacity; require a vessel to remain on-site for continuous processing and offloading; not be big enough to cover the affected area; and require several hose connections that would introduce potential multiple failure points.

57.     On November 16, 2018, the Coast Guard issued a Notice of Federal Assumption ("Notice") and assumed authority under Section 311(c) of the CWA, 33 U.S.C. § 1321(c), for containing the MC-20 Oil Discharge.

58.     Under the Notice the Coast Guard assumed all activities related to the development and installation of a containment system; removal and disposal of oil collected in

the containment system; and maintenance of a containment system at the MC-20 Facility.

59.     In December 2018, the Coast Guard commenced operations to contain the MC-20 Oil Discharge working with a third party contractor to construct a new containment system to collect the oil. The Coast Guard accessed the Oil Spill Liability Trust Fund to pay for this work. The Fund has incurred $43,269,064.68 in removal costs and interest related to the MC-20 Oil Discharge as of March 13, 2020.

60.     As a result of the oil discharge and substantial threat of oil discharge from the MC-20 Facility, the United States has expended and will continue to expend removal costs within the meaning of the OPA, 33 U.S.C. § 2702(b).

61.     The MC-20 Oil Discharge resulted in a discharge of oil "in such quantities as may be harmful," within the meaning of the CWA, 33 U.S.C. § 1321(b)(3).

62.     The amount of damages and the extent of injuries sustained by the United States as a result of the MC-20 Oil Discharge is not yet fully known.

### C.     The Coast Guard's Removal Costs and Demands for Payment

63.     On July 11, 2017, the Coast Guard, on behalf of the Fund, sent Defendant a written request for reimbursement of removal costs incurred by the United States in the amount of $176,991.94, of which Defendant subsequently paid $4,291.46, leaving an unpaid balance of $172,700.48.

64.     On July 10, 2019, the Coast Guard, on behalf of the Fund, sent Defendant an additional written request for reimbursement of removal costs incurred by the United States in the amount of $27,132,834.30.

65.     On March 13, 2020, the Coast Guard, on behalf of the Fund, sent Defendant a written request for reimbursement of removal costs incurred by the United States in the amount

of $15,673,417.77. The March 2020 invoice included a summary of all unpaid costs from the

July 2017 and 2019 invoices, and as well as incurred interest as of that date for a total amount

owed to the Fund of $43,269,064.68.

66.    Defendant has not paid the Coast Guard the $43,269,064.68, owed to the Fund in

removal costs and interest, incurred by the United States in connection with the MC-20 Oil

Discharge.

67.    Defendant has denied it is liable for any removal costs, damages, or penalties

sought in this Complaint.

## V.    LEGAL CONTENTIONS SUPPORTING CLAIMS FOR RELIEF

68.    Defendant is a "person" within the meaning of OPA Section 1001(27), 33 U.S.C.

§ 2701(27) and CWA Section 311(a)(7), 33 U.S.C. § 1321(a)(7).

69.    The MC-20 Facility is a "facility" within the meaning of OPA Section 1001(9),

33 U.S.C. § 2701(9).

70.    The MC-20 Facility is an "offshore facility" within the meaning of OPA Section

1001(22), 33 U.S.C. § 2701(22) and CWA Section 311(a)(11), 33 U.S.C. § 1321(a)(11).

71.    The MC-20 Facility is an "Outer Continental Shelf Facility" within the meaning

of OPA Section 1001(25), 33 U.S.C. § 2701(25).

72.    At all times material herein, Defendant was the "owner or operator" of the MC-20

Facility within the meaning of OPA Section 1001(26)(A)(ii), 33 U.S.C. § 2701(26)(A)(ii) and

CWA Section 311(a)(6), 33 U.S.C. § 1321(a)(6).

73.    At all times material herein, Defendant was a "lessee" or "permittee," within the

meaning of OPA Sections 1001(16) or (28), 33 U.S.C. § 2701(16) or (28), of the MC-20 Block.

74.    Defendant is a "responsible party" within the meaning of OPA Section

1001(32)(C), 33 U.S.C. § 2701(32)(C).

75.     The discharge of oil into the Gulf of Mexico was a "discharge" of "oil" into "navigable waters" as those terms are defined in OPA Section 1001(7), 33 U.S.C. § 2701(7) and CWA Section 311(a)(2), 33 U.S.C. § 1321(a)(2) ("discharge"); OPA Section 1001(23), 33 U.S.C. § 2701(23) and CWA Section 311(a)(1), 33 U.S.C. § 1321(a)(1) ("oil"); and OPA Section 1001(21), 33 U.S.C. § 2701(21) ("navigable waters").

76.     The Coast Guard undertook "removal" actions within the meaning of OPA Section 1001(30), 33 U.S.C. § 2701(30).

77.     The toppling of the MC-20A Platform, the resulting or subsequent damage to related wells and equipment, and subsequent actions or inactions by Defendant at the MC-20 Facility resulting in the ongoing MC-20 Oil Discharge from the MC-20 Facility, are an "incident" or "incidents" within the meaning of OPA Section 1001(14), 33 U.S.C. § 2701(14).

78.     The costs incurred by the Fund for the Coast Guard's removal action conducted in response to the release of oil from the MC-20 Facility were "removal costs" within the meaning of OPA Sections 1001(31) and 1002(b)(1), 33 U.S.C. §§ 2701(31) and 2702(b)(1).

79.     The United States may sustain "damages," within the meaning of OPA Section 1002(b)(2), 33 U.S.C. § 2702(b)(2), for, inter alia, injuries to, destruction of, loss of, or loss of use of natural resources, damages for injury to real or personal property, loss of profits and earning capacity, loss of subsistence use, and net loss of taxes, royalties, rents, fees, and net profit shares due to the injury to, destruction of, and loss of real property, personal property, and natural resources.

80.     The United States may incur costs or expenses in the restoration or replacement of natural resources damaged or destroyed as a result of the discharge of oil or a hazardous

14

substance in violation of Section 311(b) of the CWA, 33 U.S.C. § 1321(b).

## VI.    FIRST CLAIM FOR RELIEF
## REMOVAL COSTS UNDER OPA SECTION 1002(a), 33 U.S.C. § 2702(a)

81.    The United States re-alleges Paragraphs 1 – 80 above as if fully set forth herein.

82.    As a lessee and/or permittee of the MC-20 Block at the time of the MC-20 Oil

Discharge, Defendant is liable to the United States under OPA Sections 1002(a) and 1005, 33

U.S.C. §§ 2702(a) and 2705, for all removal costs resulting from the MC-20 Oil Discharge and

interest on the amount paid in satisfaction of the claim.

## VII.    SECOND CLAIM FOR RELIEF
## REMOVAL COSTS UNDER OPA SECTION 1004(c)(3), 33 U.S.C. § 2704(c)(3)

83.    The United States re-alleges Paragraphs 1 – 80 above as if fully set forth herein.

84.    As an owner and/or operator of the MC-20 Facility, an Outer Continental Shelf

facility from which oil was discharged, Defendant is liable to the United States under OPA

Sections 1004(c)(3) and 1005, 33 U.S.C. §§ 2704(c)(3) and 2705, for all removal costs incurred

by the United States in connection with the discharge or substantial threat of discharge from the

MC-20 Facility and interest on the amount paid in satisfaction of the claim.

## VIII.    THIRD CLAIM FOR RELIEF
## DECLARATORY JUDGMENT THAT DEFENDANT IS LIABLE FOR
## REMOVAL COSTS AND DAMAGES

85.    The United States re-alleges Paragraphs 1 – 80 above as if fully set forth herein.

86.    As a result of Lease OCS-G 04935 and the various agreements alleged herein,

Defendant became and remains a "responsible party" for the MC-20 Facility, an "offshore

facility" within the meaning of the OPA, 33 U.S.C. § 2701 *et seq*.

87.    At all times material herein, Defendant was the owner or operator of the MC-20

Facility and has been and remains a "responsible party" for an "offshore facility" within the

meaning of the OPA, 33 U.S.C. § 2701 *et seq*.

88.     The United States may sustain "damages," as that term is defined in 33 U.S.C. § 2702(b)(2), for, *inter alia*, injuries to, destruction of, loss of, or loss of use of natural resources, damages for injury to real or personal property, loss of profits and earning capacity, loss of subsistence use, and net loss of taxes, royalties, rents, fees, and net profit shares due to the injury to, destruction of, and loss of real property, personal property, and natural resources.

89.     An actual controversy exists between the United States and Defendant.

90.     Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and the OPA, 33 U.S.C. §§ 2702(a), 2704(c)(3), 2705, and 2717(f), the United States is entitled to, and hereby seeks, a declaratory judgment, that is binding in any subsequent action or actions against Defendant, that Defendant is liable for any removal costs or  damages resulting from the MC-20 Oil Discharge that are demonstrated  in any such subsequent action or actions.

### IX.     FOURTH CLAIM FOR RELIEF
### CIVIL PENALTIES UNDER CWA SECTION 311(b), 33 U.S.C. § 1321(b)

91.     The United States re-alleges Paragraphs 1 – 80 above as if fully set forth herein.

92.     As the owner, operator, or person in charge of the MC-20 Facility, an offshore facility from which oil was discharged, Defendant is liable for a civil penalty of up to $37,500 per day of violation or up to $2,100 per barrel of oil discharged for each violation of Section 311(b)(3) of the CWA that occurred after December 6, 2013, through November 2, 2015 and up to $48,192 per day or up to $1,928 per barrel of oil discharged for each violation of Section 311(b)(3) of the CWA that occurred after November 2, 2015, pursuant to CWA Section 311(b)(7), 33 U.S.C. § 1321(b)(7), and 33 C.F.R. § 27.3.

93.     As the owner, operator, or person in charge of the MC-20 Facility, an offshore facility from which oil was discharged, Defendant is liable for a civil penalty of at least $150,000

16

or up to $5,300 per barrel of oil discharged for each violation of Section 311(b)(3) of the CWA

that occurred after December 6, 2013 through November 2, 2015, and at least $192,768 or up to

$5,783 per barrel for violations that occurred after November 2, 2015, to the extent that the

violation is the result of gross negligence or willful misconduct, pursuant to CWA Section

311(b)(7), 33 U.S.C. § 1321(b)(7), and 33 C.F.R. § 27.3.

## X.   FIFTH CLAIM FOR RELIEF
### DECLARATORY JUDGEMENT THAT DEFENDANT IS LIABLE FOR RESTORATION COSTS INCURRED BY THE UNITED STATES

94.      The United States re-alleges Paragraphs 1 – 80 above as if fully set forth herein.

95.      At all times material herein, Defendant was the owner or operator of the MC-20

Facility, an offshore facility from which oil was, and continues to be, discharged.

96.      The United States may incur costs or expenses in the restoration or replacement of

natural resources damaged or destroyed as a result of the discharge of oil from the MC-20

Facility.

97.      An actual controversy exists between the United States and Defendant.

98.      In the alternative to the third claim for relief with respect to natural resource

damages (one among the several categories of damages addressed in the third claim for relief),

pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, the United States is entitled to, and

hereby seeks, a declaratory judgment, that is binding in any subsequent action or actions seeking

such damages against Defendant, that Defendant is liable under CWA Section 311(f), 33 U.S.C.

§ 1321(f) for costs or expenses incurred by the United States in the restoration or replacement of

natural resources damaged or destroyed as a result of the discharge of oil from the MC-20

Facility.

## REQUEST FOR RELIEF

WHEREFORE, the United States respectfully requests that this Court:

A.      Award the United States $43,269,064.68 in removal costs and accrued interest, plus all other removal costs and interest incurred by the United States through the date of judgment;

B.      Enter a declaratory judgment that Defendant is liable under OPA Sections 1002(a) and 1005, 33 U.S.C. §§ 2702(a) and 2705, for all removal costs and damages resulting from the MC-20 Oil Discharge, which will be binding on any subsequent action or actions to recover removal costs or damages;

C.      Enter a declaratory judgment that Defendant is liable under OPA Sections 1004(c)(3) and 1005, 33 U.S.C. §§ 2704(c)(3) and 2705, for all removal costs and interest incurred by the United States in connection with the discharge or substantial threat of discharge of oil from the MC-20 Facility, which will be binding on this action and on any subsequent action or actions to recover removal costs and interest;

D.      Assess a civil penalty against Defendant in an amount to be determined by the Court;

E.      Enter a declaratory judgment that Defendant is liable under CWA Section 311(f), for any costs or expenses incurred by the United States in the restoration or replacement of natural resources damaged or destroyed as a result of the discharge of oil from the MC-20 Facility;

F.      Award the United States its costs of this action; and

G.      Grant such other relief as the Court deems just and proper.

18

Respectfully submitted,

JEFFREY BOSSERT CLARK
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice
Washington, D.C.


*/s/ R. Shea Diaz*
R. SHEA DIAZ, T.A. (D.C. Bar # 1500278)
RICHARD GLADSTEIN (D.C. Bar # 362404)
SCOTT CERNICH (D.C. Bar # 479851)
MARK C. ELMER (D.C. Bar # 453066)
SAMANTHA RICCI (Cal. Bar # 324517)
U.S. Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 514-3211
rebecca.diaz@usdoj.gov


PETER G. STRASSER
UNITED STATES ATTORNEY

PETER M. MANSFIELD (#28671)
Assistant United States Attorney
Chief, Civil Division
650 Poydras Street, Suite 1600
New Orleans, Louisiana 70130
Telephone: (504) 680-3047
Email: peter.mansfield@usdoj.gov

OF COUNSEL:

PATRICIA KINGCADE
Attorney Advisor
National Pollution Funds Center, US Coast Guard
2703 Martin Luther King Jr. Avenue SE
Washington, DC 20593

HEATHER S. KENNEALY
Attorney Advisor
U.S. Coast Guard Headquarters

19

Office of Claims and Litigation (CG-LCL)
2703 Martin Luther King Jr. Avenue, SE, Stop 7213
Washington, DC 20593-7213