**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CIVIL ACTION NO. 20-2910 |
| | ) | |
| Plaintiff, | ) | SECTION: T(5) |
| | ) | |
| v. | ) | JUDGE: GUIDRY |
| | ) | |
| TAYLOR ENERGY COMPANY LLC, | ) | MAGISTRATE JUDGE: NORTH |
| | ) | |
| Defendant. | ) | |



**CONSENT DECREE AMONG TAYLOR ENERGY COMPANY LLC, TEC'S
AFFILIATED ENTITIES, THE UNITED STATES OF AMERICA, AND
THE STATE OF LOUISIANA**

TABLE OF CONTENTS

I.      BACKGROUND ................................................................................................ 1
II.     JURISDICTION AND VENUE ...................................................................... 5
III.    APPLICABILITY .......................................................................................... 6
IV.     DEFINITIONS................................................................................................ 6
V.      DISMISSAL OF CLAIMS BY TEC AGAINST THE UNITED STATES ................. 11
VI.     TRANSFER OF DECOMMISSIONING TRUST ........................................ 12
VII.    COOPERATION WITH FUTURE REMOVAL AND DECOMMISSIONING ACTIVITIES ... 14
VIII.   INITIAL PAYMENTS: CIVIL PENALTY, REMOVAL COSTS, AND NATURAL
RESOURCE DAMAGES ........................................................................................ 19
IX.     PAYMENT INSTRUCTIONS ...................................................................... 20
X.      FUNDS HELD IN TRUST ............................................................................ 21
XI.     PAYMENTS FROM UNUSED RESERVED FUNDS AND LIQUIDATION OF NON-LIQUID
ASSETS ................................................................................................................ 22
XII.    FORCE MAJEURE ...................................................................................... 23
XIII.   DISPUTE RESOLUTION ............................................................................. 25
XIV.    COVENANTS NOT TO SUE OR ASSERT CLAIMS AND RESERVATIONS ...................... 28
XV.     COSTS .......................................................................................................... 30
XVI.    NOTICES....................................................................................................... 31
XVII.   EFFECTIVE DATE....................................................................................... 33
XVIII.  RETENTION OF JURISDICTION .............................................................. 34
XIX.    MODIFICATION .......................................................................................... 34
XX.     TERMINATION ............................................................................................ 34
XXI.    PUBLIC PARTICIPATION .......................................................................... 35
XXII.   SIGNATORIES/SERVICE............................................................................ 35
XXIII.  INTEGRATION ............................................................................................ 36
XXIV.  FINAL JUDGMENT ..................................................................................... 36
XXV.   APPENDICES ............................................................................................... 36

## I.    BACKGROUND

A.      This Consent Decree addresses civil claims between the United States and Taylor

Energy Company LLC ("TEC") arising from the MC-20 Incident, defined below, including

claims by the United States against TEC for a civil penalty and reimbursement of oil removal

costs and damages, as well as judicial and administrative claims asserted by TEC against the

United States. The Consent Decree also addresses certain limited obligations and rights of TEC's

Affiliated Entities (defined below) and civil claims of the State of Louisiana against TEC arising

from the MC-20 Incident. The United States, Taylor Energy Company LLC, and the State of

Louisiana are collectively referred to as "Parties" and each individually as a "Party."

B.      The MC-20 Incident arose on or about September 16, 2004, when the oil

production platform owned and operated by TEC in the Mississippi Canyon Block 20 ("MC-20")

lease area in the Gulf of Mexico collapsed during Hurricane Ivan, initiating an oil discharge.

C.      From late 2007 until November 2018, efforts to address the MC-20 Incident were

coordinated through a "Unified Command" established in accordance with the National

Contingency Plan under the direction of the United States Coast Guard's ("Coast Guard")

Federal On-Scene Coordinator. TEC participated in the Unified Command and performed or

paid for substantially all response activities during this period. The Unified Command also

included representatives of the United States Department of the Interior ("DOI"), and staff from

the National Oceanic and Atmospheric Administration ("NOAA") provided support to the

Unified Command from time to time.

D.      On October 23, 2018, the Coast Guard issued Administrative Order No. 19-001 to

TEC, ordering it to institute a new containment system to capture, contain, and remove oil

discharged at the MC-20 Facility, defined below. On November 16, 2018, the Coast Guard

1

issued a Notice of Federal Assumption, asserting authority under Section 311(c) of the Clean

Water Act ("CWA"), 33 U.S.C. § 1321(c), for all activities related to the development and

installation of the containment system; removal and disposal of oil collected in the containment

system; and maintenance of the containment system at the MC-20 Facility. In December 2018,

the Coast Guard commenced operations, working with a third-party contractor to design,

fabricate and install the containment system. The installation of this containment system and

subsequent federal removal activities at the MC-20 Facility were paid for by the United States,

drawing on the Oil Spill Liability Trust Fund ("OSLTF"). TEC challenged the legality of these

actions by the Coast Guard in a lawsuit still pending in this Court, *Taylor Energy Company LLC*

*v. Luttrell, et al.*, Case No. 2:18-cv-14046 (E.D. La.).

E.      On November 16, 2018, TEC sought reimbursement of its removal costs arising

from the MC 20 Incident, alleged to be over $350 million, from the OSLTF by submitting an

"act of God" defense claim to the United States Coast Guard National Pollution Funds Center

("NPFC") in accordance with the regulations promulgated under Section 2713(e) of the Oil

Pollution Act ("OPA"), 33 U.S.C. § 2713(e). The NPFC denied TEC's claim, and TEC sought

judicial review of the denial in a lawsuit still pending in the United States District Court for the

District of Columbia, *Taylor Energy Company LLC v. United States of America, Acting By and*

*Through the United States Coast Guard, And The United States Coast Guard National Pollution*

*Funds Center*, Case No. 1:20-cv-01086-JDB (D.D.C.).

F.      The United States filed the Complaint that initiated this lawsuit against TEC on

October 23, 2020, alleging, among other things, that TEC is liable under the CWA for a civil

penalty for the unauthorized discharge of oil and is liable without limitation under OPA for

2

removal costs and damages incurred by the United States, including damages for injuries to, destruction of, loss of, or loss of use of natural resources resulting from the MC-20 Incident.

G.      For the purposes of this Consent Decree, the State of Louisiana (the "State") is deemed to have filed a complaint, asserted claims, and taken action against TEC under Section 2480 *et seq*. of the Oil Spill Prevention and Response Act ("OSPRA"), La. R.S. 30:2480 *et seq*., and Section 1002(a) and (b)(2) of OPA, 33 U.S.C. §2702(a) and (b)(2), for natural resource damages resulting from the MC-20 Incident.

H.      Three lawsuits filed by TEC against the United States or its officers, employees, or contractors relating to the MC-20 Incident are pending in United States District Courts, and an appeal by TEC of a Bureau of Safety and Environmental Enforcement ("BSEE") order relating to the MC-20 Incident is pending before the Interior Board of Land Appeals ("IBLA"). These actions by TEC against the United States are listed in Section V of this Consent Decree.

I.      This Consent Decree takes into account that TEC has ceased all oil and gas operations, has limited ability to pay, and intends to wind down its remaining affairs and fully liquidate after this Consent Decree becomes effective.

J.      TEC allowed its lease of the MC-20 Block to lapse in 2007 and, by mid-2008, sold its remaining operating assets. Since that time, TEC has continued to exist to address the MC-20 Incident.

K.      Under the Outer Continental Shelf Lands Act ("OCSLA"), its implementing regulations, and the MC-20 Lease terms, after termination of the lease, TEC became obligated to decommission the facilities on the MC-20 Lease, and to permanently plug and abandon the Facility's 28 undersea oil and gas wells in accordance with DOI regulations.

L.      At the time of the 2008 TEC asset sale, DOI negotiated with TEC to set aside approximately $666.3 million in a "Decommissioning Trust" to fund certain decommissioning actions, including plugging and abandonment of the wells and soil remediation, at the MC-20 Facility. With DOI's approval, TEC was reimbursed with money from the Decommissioning Trust for work relating to 9 of the 28 oil and gas wells, and other decommissioning activities. TEC also retained certain assets, in addition to the Decommissioning Trust, that it has used to pay costs associated with the MC-20 Incident as well as expenses relating to other matters, including its limited business affairs.

M.      TEC and TEC's Affiliated Entities do not admit any liability to the United States or the State arising out of the MC-20 Incident or the other transactions or occurrences alleged in the Complaint in this case.

N.      The United States does not admit any liability to TEC arising out of any of the transactions or occurrences alleged in any of TEC's civil or administrative lawsuits or appeals.

O.      The United States is resolving these matters in coordination with the Coast Guard, including its NPFC and the OSLTF, DOI, including DOI's Bureau of Ocean Energy Management ("BOEM") and BSEE, and NOAA.

P.      If the Trustees determine that the amount paid for natural resource damages under this Consent Decree is less than the full amount of natural resource damages resulting from the MC-20 Incident, the Trustees anticipate that one or more of them will submit claims for the difference to the OSLTF.

Q.      The Parties agree, and the Court by entering this Consent Decree finds, that the Consent Decree: (i) has been negotiated at arm's length, in good faith, and will limit, avoid and resolve complex litigation between the Parties; and (ii) is fair, reasonable, and furthers the

4

objectives of the statutes under which the United States and the State have asserted claims against TEC.

R.    The Parties agree that the Complaint in this case and this Consent Decree constitute diligent prosecution by the United States against TEC of any and all claims arising from the MC-20 Incident for the purposes of Section 505(b) of the CWA, 33 U.S.C. § 1365(b).

S.    The Environment and Natural Resources Division of the United States Department of Justice is not aware of any federal civil claim against TEC or its Affiliated Entities arising from or relating to the MC-20 Incident, the MC-20 Facility, or the MC-20 Site that is not resolved by this Consent Decree.

T.    The State is not aware of any civil, criminal or administrative claims held by the State against TEC or its Affiliated Entities arising from or relating to the MC-20 Incident, the MC-20 Facility, or the MC-20 Site that are not resolved by this Consent Decree.

U.    NOW, THEREFORE, without the adjudication or admission of any issue of fact or law except as provided in Section II, with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

II.    JURISDICTION AND VENUE

1.    This Court has jurisdiction over the subject matter of this action, pursuant to 33 U.S.C. §§ 1321(b) and 2717(b), and 28 U.S.C. §§ 1331, 1345, and 1355, and over the Parties for the purposes of the entry and enforcement of this Consent Decree. Venue lies in the Eastern District of Louisiana pursuant to 33 U.S.C. § 2717(b), 33 U.S.C. § 1321(b)(7)(E); and 28 U.S.C. §§ 98(a), 1391, and 1395. For purposes of this Consent Decree, or any action to enforce this Consent Decree, the Parties consent to the District Court's jurisdiction over this Consent Decree,

any such action, and the Parties, and consent to venue in this judicial district. This Court has

supplemental jurisdiction over any state law claims asserted by the State.

2.     The Court finds and the Parties agree that the Court has authority to enter this

Consent Decree as to all claims addressed herein.

### III.    APPLICABILITY

3.     The obligations of this Consent Decree apply to and are binding upon the United

States, the State, and TEC, any legal successor of TEC, and, as to provisions specifically

applicable to them, TEC's Affiliated Entities. TEC's Affiliated Entities are parties to this

Consent Decree for the limited purposes of the covenants not to sue in Section XIV and of the

undertakings and rights specifically applicable to them in Sections VI and XIII and Paragraphs 1,

2, 3, 5, 18 through 20, 28, 32, and 74; provided, however, that no TEC Affiliated Entity other

than Phyllis M. Taylor, William W. Pecue II, Dina Bracci Riviere, or Endeavor Enterprises

L.L.C. is entitled to enforce any obligation of the United States in Section VI. To the extent any

obligations under this Consent Decree are applicable to TEC's Affiliated Entities, a breach by

any one of the Affiliated Entities shall not be construed as a breach by TEC or by any other of

the Affiliated Entities.

4.     TEC must provide a copy of this Consent Decree to all officers, employees, and

agents whose duties might reasonably include compliance with any provision of this Consent

Decree.

### IV.    DEFINITIONS

5.     Terms used in this Consent Decree that are defined in the CWA, OPA, or

OCSLA, or in regulations promulgated pursuant to the CWA, OPA, or OCSLA, have the

meanings assigned to them in the respective acts or the respective regulations, unless otherwise

provided in this Consent Decree. Whenever the terms set forth below are used in this Consent
Decree, the following definitions apply:

"BOEM" means the Bureau of Ocean Energy Management within DOI;

"BP" means BP plc, BP Exploration & Production Inc., BP Exploration & Oil Inc., and
all legal successors, subsidiaries, and affiliates with potential liability for decommissioning of the
MC-20 Facility or MC-20 Site;

"BSEE" means the Bureau of Safety and Environmental Enforcement within DOI;

"Consent Decree" or "Decree" means this Consent Decree and all appendices attached
hereto;

"Court" or "District Court" means the United States District Court for the Eastern District
of Louisiana;

"CWA" means the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251-1388;

"Day" or "day" means a calendar day unless expressly stated to be a business day. In
computing any period of time for a deadline under this Consent Decree, where the last day would
fall on a Saturday, Sunday, or federal holiday, the period runs until the close of business of the
next business day;

"Date of Lodging" means the date upon which the United States submits this Consent
Decree to the District Court, prior to soliciting public comment on the Consent Decree;

"Decommissioning Funds" means the funds in the Decommissioning Trust at the time
that Trust is terminated and its principal balance conveyed to BOEM as set forth in Section VI;

"Decommissioning Trust" means the trust account established with JPMorgan Chase
Bank, N.A. as trustee in accordance with the Trust Agreement dated March 19, 2008, between
TEC, as settlor, and DOI, as beneficiary;

7

"Defendant" means Taylor Energy Company LLC;

"DOI" means the United States Department of the Interior;

"DOJ" means the United States Department of Justice;

"Document" means any "document" or electronically stored information as those terms are used in the Federal Rules of Civil Procedure – including writings, drawings, graphs, charts, photographs, sound recordings, images, and other data or data compilations – stored in any medium from which information can be obtained;

"Effective Date" has the meaning assigned in Section XVII;

"EFT" means a Fedwire Electronic Funds Transfer;

"Federal Trustees" means the authorized officials of NOAA and DOI for NRD resulting from the MC-20 Incident;

"MC-20 Facility" or "Facility" means all platforms, wells, pipelines, and any other structures or equipment installed by Sohio Petroleum Company, BP, or TEC on Lease OCS-G 04935 (Mississippi Canyon Block 20); the part of Lease OCS-G-15459 (Mississippi Canyon Block 21) on which Wells A-19, A-20, A-21, A-25, and A-26 are located; and the part of Lease OCS-G 15371 (South Pass Block 73) on which Well A-28 is located, together with the submerged land under or containing these structures and equipment;

"MC-20 Incident" means the discharge of oil from the MC-20 Facility that began on September 16, 2004; the actions, inactions, and other events that caused or contributed to the commencement of the discharge (including the collapse of the Facility's platform during Hurricane Ivan and resulting damage to wells and equipment at the Facility); and the occurrences that caused or contributed to the continuation of the discharge from the Facility after September 16, 2004;

8

"MC-20 Site" means the location or site of the MC-20 Facility and the immediate surrounding area;

"Natural Resource" and "Natural Resources" means land, fish, mammals, birds, wildlife, biota, air, water, ground water, drinking water supplies, sediment, habitat, supporting ecosystem, and/or any other such resources at any time belonging to, managed by, held in trust by, appertaining to, regulated by, or otherwise controlled by the United States or the State (including resources of the exclusive economic zone; "system unit resources" as defined by 54 U.S.C. § 100721(3); and marine "sanctuary resources" as defined by 16 U.S.C. § 1432(8));

"Natural Resource Damages" ("NRD") means any costs or damages recoverable by the United States or the State as trustees or *parens patriae* on behalf of the public under Section 1002(b)(2)(A) of OPA, 33 U.S.C. § 2702(b)(2)(A); the System Unit Resources Protection Act, 54 U.S.C. § 100722 (or the former 16 U.S.C. § 19jj-1, repealed Dec. 19, 2014); the National Marine Sanctuaries Act, 16 U.S.C. § 1443; Section 311(f)(4) and (5) of the CWA, 33 U.S.C. §§ 1321(f)(4) and (5); Section 107(a)(4)(C) of CERCLA, 42 U.S.C. § 9607(a)(4)(C); any other federal law, state law, common law; or any federal or state regulation, as compensation to the public for injury to, destruction of, loss of, or loss of use of Natural Resources, including any natural resource services they provide, resulting from a release or threat of release of oil or a hazardous substance or any removal or response action (including any diversion of freshwater). Natural Resource Damages include, without limitation: (i) the costs of assessing injury, destruction, loss of, or loss of use of Natural Resources and the resulting damages; (ii) the costs of restoration, rehabilitation, or replacement of injured, destroyed, or lost Natural Resources and natural resource services or of acquisition of equivalent resources; (iii) the costs of planning and

monitoring such restoration activities; and (iv) any other compensation for diminution in value or loss of use or non-use values of Natural Resources;

"NOAA" means the National Oceanic and Atmospheric Administration;

"NRDAR Fund" means the DOI's Natural Resource Damage Assessment and Restoration Fund;

"OCSLA" means the Outer Continental Shelf Lands Act, 43 U.S.C. §§ 1331-1356;

"OPA" means the Oil Pollution Act, 33 U.S.C. §§ 2701-2762;

"OSLTF" means the Oil Spill Liability Trust Fund established pursuant to 26 U.S.C. § 9509 and 33 U.S.C. § 1321(s);

"OSPRA" means the Louisiana Oil Spill Prevention and Response Act, La. R.S. 30:2451 *et seq*.;

"Paragraph" means a portion of this Consent Decree identified by an Arabic numeral;

"Parties" means the United States, the State of Louisiana, and TEC;

"Section" means a portion of this Consent Decree identified by a Roman numeral;

"State" means the State of Louisiana and all its agencies and instrumentalities;

"State Trustees" means the Louisiana Oil Spill Coordinator's Office, Department of Public Safety; Louisiana Department of Natural Resources; Louisiana Department of Environmental Quality; Louisiana Department of Wildlife and Fisheries; and the Coastal Protection and Restoration Authority;

"Taylor Energy Company LLC" or "TEC" means Taylor Energy Company LLC, successor by merger to Taylor Energy Company, a Louisiana corporation;

"TEC's Affiliated Entities" or "Affiliated Entities" means Phyllis M. Taylor; William W. Pecue II; Dina Bracci Riviere; Endeavor Enterprises L.L.C.; the present or former officers,

directors, and employees of TEC or Endeavor Enterprises L.L.C. to the extent their liability (if any) arises from their status as officer, director, or employee or from acts or omissions within the scope of their employment or official duties;

"Trustee" or "Trustees" means one or more Federal Trustees and/or State Trustees;

"United States" means the United States and all its agencies and instrumentalities;

"USCG" or "Coast Guard" means the United States Coast Guard.

V.      DISMISSAL OF CLAIMS BY TEC AGAINST THE UNITED STATES

6.      No later than 15 days after the Effective Date, TEC will file voluntary dismissal stipulations under Rule 41(a)(1)(A)(ii), Fed. R. Civ. P. 41(a)(1)(A)(ii), in each of the following civil actions (a.-c.). If Defendant-Intervenor Healthy Gulf does not stipulate to dismissal of the civil action described in 6.a., TEC will request dismissal under Rule 41(a)(2), Fed. R. Civ. P. 41(a)(2).

    a.      *Taylor Energy Company LLC v. Captain Kristi M. Luttrell, in her Official Capacity as Federal On-Scene Coordinator for the MC20 Unified Command, and the United States of America, Acting by and Through the United States Coast Guard*, United States District Court for the Eastern District of Louisiana, Case No. 2:18-cv-14046

    b.      *Taylor Energy Company LLC v. United States Department of the Interior, Debra Haaland, in her Official Capacity as Secretary of the United States Department of the Interior, and the Bureau of Ocean Energy Management*, United States District Court for the Eastern District of Louisiana, Case No.: 18-cv-14065

    c.      *Taylor Energy Company LLC v. United States of America*, United States District Court for the District of Columbia, Case No. 1:20-01086-JDB

7.      Within 15 days after the Effective Date, TEC and BSEE will move jointly to dismiss, remand, and vacate *Taylor Energy Company LLC*, IBLA No. 2021-14 at the IBLA.

11

VI.    TRANSFER OF DECOMMISSIONING TRUST

8.    As of November 30, 2021, the Decommissioning Trust had a principal balance of $432,523,718, excluding accrued interest.

9.    Within 15 days after the Effective Date, TEC and DOI will jointly notify the trustee of the Decommissioning Trust that the Decommissioning Trust is terminated pursuant to Section 6.8(a) of the Decommissioning Trust and that the principal balance of the Decommissioning Trust must be conveyed to BOEM in accordance with the account information provided. A draft letter notifying the Decommissioning Trustee of the termination of the Decommissioning Trust is set forth in Appendix 1.

10.    Except as provided in Paragraph 16, DOI will use the Decommissioning Funds exclusively for purposes of performing decommissioning activities (including soil remediation) relating to the MC-20 Facility and MC-20 Site consistent with the relevant DOI regulations, including 30 C.F.R. Part 250. DOI's use of the Decommissioning Funds may include, in its sole discretion, studies, planning, and work relating to the decommissioning activities (including soil remediation) relating to the MC-20 Facility and MC-20 Site consistent with the relevant DOI regulations.

11.    Except as provided in Paragraph 16, DOI may use the Decommissioning Funds to pay its own costs relating to decommissioning activities (including soil remediation) relating to the MC-20 Facility and MC-20 Site, or to pay or reimburse one or more contractors or third parties (which may include former lessees of MC-20) who undertake such work.

12.    TEC and TEC's Affiliated Entities shall have no role in, and may not challenge, any decision by DOI on the use of the Decommissioning Funds, provided that the Decommissioning Funds are utilized in accordance with this Section VI.

13.     The United States acknowledges that the Decommissioning Funds shall apply against any decommissioning (including soil remediation) liabilities associated with the MC-20 Facility and MC-20 Site, including such decommissioning (and soil remediation) liabilities owed jointly and severally by TEC and BP.

14.     If the Decommissioning Funds are exhausted before decommissioning (including soil remediation) at the MC-20 Facility and MC-20 Site is complete, neither TEC nor its Affiliated Entities will have any liability or responsibility for further decommissioning (including soil remediation) work or costs.

15.     TEC and its Affiliated Entities waive any right or claim they might otherwise have to the return of any Decommissioning Funds determined by DOI not to be necessary for decommissioning (including soil remediation) relating to the MC-20 Facility and MC-20 Site, including any rights under 43 U.S.C. § 1338a.

16.     If any of the Decommissioning Funds remain unspent and unobligated when DOI determines that decommissioning (including soil remediation) relating to the MC-20 Facility and MC-20 Site is complete in accordance with law and regulations applicable to lessees or former lessees ("Residual Decommissioning Funds"), those Residual Decommissioning Funds must be transferred into the OSLTF and may be used, in the United States' discretion, for any purpose listed in 33 U.S.C. § 2712, including to pay future removal costs relating to the MC-20 Incident or the costs of assessing NRD or restoring, replacing, rehabilitating, or acquiring the equivalent of Natural Resources (including natural resource services) injured, lost, or destroyed as a result of the MC-20 Incident, or the costs of planning and monitoring such restoration activities.

17.     TEC and its Affiliated Entities may not challenge DOI's determination that decommissioning (including soil remediation) relating to the MC-20 Facility or MC-20 Site is or

13

is not complete, nor may they challenge any use of Residual Decommissioning Funds that occurs after DOI has made that determination.

VII.    COOPERATION WITH FUTURE REMOVAL AND DECOMMISSIONING ACTIVITIES

18.    TEC and the United States stipulate that, as of the Effective Date, TEC and its Affiliated Entities will no longer be performing any obligations or activities with respect to the MC-20 Facility or MC-20 Site, including under Lease OCS-G 04935 (the MC-20 lease), for purposes of BOEM's regulations at 30 C.F.R. § 556.710.

19.    As of the Effective Date, TEC and its Affiliated Entities relinquish any possession, custody, and control of the MC-20 Facility and MC-20 Site and consent to the removal, destruction, or other disposition, without any claim for compensation, of all equipment or structures at or comprising part of the MC-20 Facility and MC-20 Site over which TEC has or previously had a claim of ownership or right to control, if the action is performed by or at the request of the United States.

20.    TEC and its Affiliated Entities shall not interfere in any way with removal, remediation, or decommissioning efforts at or relating to the MC-20 Facility or MC-20 Site that are performed by or at the request of the United States.

21.    <u>Information Transfer</u>. The United States and TEC have engaged in cooperative discussions to identify TEC Documents and information that the United States believes would facilitate future decommissioning, soil remediation, removal, or NRD assessment work and to develop procedures to orderly preserve, collect, and make available or transfer to the United States such documents and information to the extent practicable, taking into account TEC's contractual obligations to its contractors to protect their confidential business information

14

("CBI") and intellectual property rights and the limits on TEC's available resources after making the payments required by this Consent Decree. TEC will not withhold access to or assert CBI protections as to Documents or information in its possession or unrestricted control unless they are subject to a contractual limitation on disclosure to third parties that remains binding on TEC. TEC represents, however, that it does not have unrestricted discretion to produce certain documents and information requested by the United States because of contractual commitments by TEC to protect the CBI or trade secrets of TEC contractors ("TEC Contractor CBI"). The TEC contractors who may possess Documents or information listed in Appendix 2 ("Appendix 2 Documents") are identified in Appendix 3 ("TEC Contractors").

22.    Within 5 days after lodging of this Consent Decree with the Court, TEC must mail to each TEC Contractor listed on Appendix 3 a letter in the form set forth in Appendix 4 instructing each contractor to preserve all Appendix 2 Documents in the contractor's possession or control and authorizing the contractor to make any and all Appendix 2 Documents available to the United States after the Effective Date, and waiving any TEC CBI claims. TEC shall send a copy of each such letter to the United States. Thereafter, subject to Paragraph 28, TEC has no further obligation with regard to Appendix 2 Documents in the possession or unrestricted control of TEC Contractors. The resolution of any concerns about production raised by a TEC Contractor will be between the United States and that contractor, without objection by TEC. If, in the course of assembling and producing the Appendix 2 Documents, TEC identifies any TEC contractor not listed in Appendix 3 that contributed to, created, or possesses Appendix 2 Documents, including TEC Contractor CBI, not produced by TEC, the Parties may amend Appendix 3 to add the TEC contractor and such amendment shall be a non-material modification to the Consent Decree.

15

23.     Electronic information and paper documents. Within 60 days after the Effective Date, TEC must make available to the United States, in an organized and orderly manner, all Appendix 2 Documents within TEC's possession or unrestricted control that do not contain TEC Contractor CBI.

    a.      For Appendix 2 Documents that are electronically stored information ("ESI") (including pdf files, Microsoft Word files, Microsoft Excel files, digital photographs, data from databases, CAD drawings, GIS data, videos, etc.), TEC must transfer the documents and information to the United States via file transfer protocol or removable media (*e.g.*, flash drive or portable hard drive). ESI must be produced in native format to the extent no redactions are required to protect TEC Contractor CBI. All reports, surveys, data products, and other work products that include data must include the associated digital data in electronic or spreadsheet formats, if the data exists in such formats. TEC will confer with, and provide reasonable cooperation to, the United States in the event the United States is unable to open or use the TEC-produced ESI. For all TEC-produced ESI, TEC will put the electronic files in appropriate subfolders corresponding to the Appendix 2 listing. Otherwise, TEC has no obligation to manipulate, process, or transform any ESI for purposes of compliance with this Consent Decree.

    b.      For Appendix 2 Documents that are stored only on paper ("Appendix 2 Paper Documents"), TEC must collect the materials in a single repository, preserving to the greatest extent practicable the organizations and file identifications in which they have been maintained, and allow representatives of the United States to inspect the Appendix 2 Paper Documents at reasonable times

16

and to copy or scan any or all of them, including by arranging for copying or scanning off-site at a mutually agreed vendor. The United States will bear the cost of any such copying or scanning of Appendix 2 Paper Documents. Copying or scanning will be performed in reasonable batches, none of which will exceed one-fifth of the total volume, to ensure that TEC does not lose control over its critical business records pending ultimate liquidation. Except when the selected Appendix 2 Paper Documents are moved off-site for copying or scanning, TEC must preserve the Appendix 2 Paper Documents and their organization in this repository until TEC has completed its liquidation or the United States takes possession of the original documents, whichever occurs first. At least 10 days before TEC completes its liquidation, TEC must give the United States notice that the original Appendix 2 Paper Documents in the repository are available to be taken into the United States' possession and must reasonably facilitate pickup of the documents by the United States or its contractor, which will be at the cost of the United States.

24.     To the extent TEC believes that Appendix 2 Documents or portions of the Appendix 2 Documents are TEC Contractor CBI, TEC must, within 60 days after the Effective Date, provide to the United States a log, organized by Appendix 2 category (Nos. 1 through 35), providing information consistent with the following example: If TEC is aware of TEC Contractor CBI in the well records for intervention well A-5 (IW5), the log entry would state "TEC Contractor CBI of [name of contractor] related to plugging operations at intervention well A-5 (IW5) (Appendix 2 Category No. _)."

17

25.     In Appendix 2, TEC has identified for each Appendix 2 category the TEC

Contractor(s) that TEC believes possess Appendix 2 Documents and information that are not in

TEC's possession or unrestricted control.

26.     <u>Physical Samples</u>. Within 60 days after the Effective Date, TEC must provide the

United States with a list or catalog of all physical samples described in Appendix 2, No. 35, in

the possession of TEC ("TEC Physical Samples"), and make such request to any TEC Contractor

for any samples in its possession (including subcontractor labs or similar facilities) ("TEC

Contractor-held Physical Samples"). If the United States determines that it wants to take

possession of any of the TEC Physical Samples, it will notify TEC in writing and will confer

with TEC to establish an orderly process for the United States to take possession of the TEC

Physical Samples at least 10 days prior to TEC liquidation, at no cost to TEC.

27.     Until TEC has fulfilled all of its obligations under this Section VII, TEC must

retain, and must instruct its contractors identified on Appendix 3 to preserve, all non-identical

copies of all Documents and information (including documents, records, or other ESI) in its or

TEC Contractors' possession or unrestricted control, or that come into its or TEC Contractors'

possession or unrestricted control, and that relate in any manner to TEC's performance of its

obligations under this Consent Decree. TEC's obligation to retain Documents and information

under this Consent Decree terminates when TEC completes its liquidation process in compliance

with Paragraph 31 and Section XI.

28.     During the information sharing process described in this Section, TEC will make

knowledgeable TEC representatives (if any are still employed by TEC or a TEC Affiliated

Entity) available to the United States at reasonable times to answer questions regarding the

organization and contents of the Appendix 2 Documents, including such documents withheld as TEC Contractor CBI.

## VIII.    INITIAL PAYMENTS: CIVIL PENALTY, REMOVAL COSTS, AND NATURAL RESOURCE DAMAGES

29.    <u>Initial payments by TEC</u>. No later than 15 Days after the Effective Date, TEC must make the following payments:

    a.    $15,000,000 to the United States as a civil penalty under Section 311(b) of the CWA;

    b.    $12,864,186 to United States in partial reimbursement of past removal costs incurred by the United States under OPA;

    c.    $16,500,000 to the United States for the joint benefit and use of the Federal Trustees and State Trustees, to be used only to restore, replace, rehabilitate, or acquire the equivalent of Natural Resources and Natural Resource services injured, lost, or destroyed as a result of the MC-20 Incident ("NRD Payment").

30.    TEC represents that the payments required under this Section VIII comprise the full accrual-based liquid assets of TEC calculated as of November 30, 2021, with the exception of $16 million reserved for the following two purposes: (1) up to a cap considered confidential by the Parties to pay (a) ongoing costs and expenses associated with TEC's business until the Effective Date, (b) costs and expenses in achieving a final and non-appealable Consent Decree and thereafter complying with its terms, and (c) reasonable and necessary expenses of winding down TEC's affairs and liquidating TEC, and (2) up to another confidential agreed-upon cap, to resolve outstanding matters relating to the litigation that TEC has identified to the United States

(collectively "Reserved Funds"). TEC's current non-liquid assets are addressed in Section XI. All Parties acknowledge that there will be miscellaneous debits and credits to TEC's liquid assets that are realized after November 30, 2021, including final earnings on the Decommissioning Funds and final trustee fees associated therewith, all of which will be included in determining the amount of the final payment to the United States under Section XI.

31.    TEC may not fully liquidate and dissolve until all payments required by this Consent Decree have been made in full and all other actions required of TEC under this Consent Decree have been satisfied.

32.    TEC and its Affiliated Entities may not capitalize into inventory or basis or take as a tax deduction any portion of the civil penalty payment due under Paragraph 29.a.

## IX.    PAYMENT INSTRUCTIONS

33.    TEC shall make the payments due under this Consent Decree by EFT to the DOJ account, in accordance with instructions provided to TEC by the Financial Litigation Unit ("FLU") of the United States Attorney's Office for the Eastern District of Louisiana after the Effective Date. The payment instructions provided by the FLU will include a Consolidated Debt Collection System ("CDCS") number, which TEC shall use to identify all payments required to be made in accordance with this Consent Decree. The FLU will provide the payment instructions, including a means of verifying the authenticity of the instructions, to:

> Dina Bracci Riviere
> Chief Financial Officer
> Taylor Energy Company LLC
> One Lee Circle
> New Orleans, Louisiana 70130
> driviereCFO@taylorenergy.com

on behalf of TEC with additional email notice to TEC in accordance with Section XVI (Notices). TEC may change the individual to receive payment instructions on its behalf by providing written notice of such change to DOJ in accordance with Section XVI (Notices).

34.     When making the payments required under Paragraph 29, TEC must make three separate payments and must identify the payments as follows: Paragraph 29.a ("Civil Penalty"); Paragraph 29.b ("Removal Costs"); and Paragraph 29.c ("NRD").

35.     After processing by the FLU, the NRD Payment shall be deposited in a segregated sub-account within the NRDAR Fund, to be managed by DOI for the joint benefit and use of the Trustees as described in Paragraph 29.c. Subject to the offset required by the 1994 CJS Appropriations Act, the payments required by Paragraphs 29.a and 29.b shall be deposited into the OSLTF.

36.     At the time of payments required under Paragraph 29, TEC shall send notice that the payments have been made to: (i) DOJ; (ii) DOI; (iii) NOAA; (iv) USCG; and (v) the State in accordance with Section XVI (Notices). Such notice shall state that the payments are owed pursuant to this Consent Decree in *United States of America v. Taylor Energy Company LLC*, and shall reference the civil action number 20-2910, the CDCS Number, and DOJ case number 90-5-1-1-11008/2.

## X.     SURETY COLLATERAL

37.     The Parties acknowledge and agree that:

a.     TEC has provided an indemnity bond in favor of BP Exploration & Oil, Inc. with a penal sum of $5,339,088, issued by National Fire Insurance Company of Hartford and identified as bond number 158 940 208 ("BP Surety Bond"), and

21

b.     approximately $6,324,756 (which includes accrued interest on the collateral) remains posted by TEC as collateral in favor of the sureties relating to its surety bond program.

38.     As of the Effective Date, TEC must take all steps necessary to release excess collateral held by the surety, anticipated to be no more than $985,668 ("Excess Collateral"), which, if and when liquidated, TEC will pay to the United States in accordance with the payment instructions in Section IX and identify it as "Removal Costs." The refusal by the surety collateral trustee to release some or all of the Excess Collateral despite TEC's best efforts shall not be considered a breach or default by TEC under this Consent Decree so long as TEC continues to take commercially reasonable steps to effectuate such release of the Excess Collateral.

39.     In addition, TEC must exercise commercially reasonable efforts to utilize $5,339,088 of the BP Surety Bond collateral to settle all bond and potential other issues with BP relating to the MC-20 Facility, the MC-20 Incident, and the MC-20 Site. TEC must contact BP to negotiate an agreement no later than 15 Days after the Date of Lodging.

XI.     PAYMENTS FROM UNUSED RESERVED FUNDS AND LIQUIDATION OF NON-LIQUID ASSETS

40.     As part of the TEC liquidation, TEC will liquidate all non-liquid assets and will pay to the United States the proceeds of such liquidation. For any real property interests owned by TEC, such liquidation shall be accomplished through an auction process established by a reputable, regional auction company, without a minimum bid or reserve.

41.     In addition, upon completion of the TEC liquidation, TEC must pay to the United States any remaining Reserved Funds that have not been used for the purposes described in Paragraph 30 above.

42.    TEC must make the payments required by Paragraphs 40 and 41 to the United States in accordance with the payment instructions in Section IX and identify the payment as "Removal Costs."

43.    TEC acknowledges that the United States will review TEC's expenditures from the Reserved Funds to verify that those expenditures were for the purposes specified in Paragraph 30 of this Consent Decree. Not later than 15 Days after TEC commences liquidation proceedings through the filing of a dissolution document with the Louisiana Secretary of State pursuant to La. R.S. 12:1339 for purposes of the United States conducting such review and verification, TEC must make available to the United States documentation showing how TEC spent any of the Reserved Funds. Specifically, TEC will provide cumulative financial information to the United States (via email "Re: DJ #90-5-1-1-11008/2" to: eescdcopy.enrd@usdoj.gov, scott.cernich@usdoj.gov, and rebecca.diaz@usdoj.gov) covering the disbursements and receipts (if any) between November 30, 2021 and the date that TEC commences liquidation, and thereafter will provide an update on a monthly basis for the preceding month until the liquidation is complete, with sufficient detail for the United States to determine whether TEC's expenditures were consistent with the specified purposes.

XII.    FORCE MAJEURE

44.    "Force Majeure," for purposes of this Consent Decree, is defined as any event arising from causes beyond the control of TEC, any entity controlled by TEC, or TEC's contractors, that delays or prevents the performance of any obligation under this Consent Decree by TEC despite TEC's best efforts to fulfill the obligation. The requirement that TEC exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential Force Majeure event and best efforts to address the effects of any potential Force Majeure event (a) as

23

it is occurring and (b) following the potential Force Majeure, such that the delay and any adverse effects of the delay are minimized. "Force Majeure" does not include TEC's financial inability to perform any obligation under this Consent Decree.

45.     If any event occurs or has occurred that may delay the performance of any TEC obligation under this Consent Decree, whether or not caused by a Force Majeure event, TEC shall provide notice by email to eescdcopy.enrd@usdoj.gov (Re: DJ #90-5-1-1-11008/2), within 5 Days of when TEC first knew that the event might cause a delay. Within 10 Days thereafter, TEC shall provide in writing to DOJ an explanation and description of the reasons for the delay; the anticipated duration of the delay; the actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or mitigate the delay or the effect of the delay; TEC's rationale for attributing such delay to a Force Majeure event if it intends to assert such a claim; and a statement as to whether, in the opinion of TEC, such event may cause or contribute to an endangerment to public health, welfare or the environment. TEC shall include with any notice documentation to support that the delay was attributable to a Force Majeure. Failure to comply with the above requirements shall preclude TEC from asserting any claim of Force Majeure for that event for the period of time of such failure to comply, and for any additional delay caused by such failure. TEC shall be deemed to know of any circumstance of which TEC or its Affiliated Entities knew or should have known.

46.     If the United States agrees that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by the United States for a duration that corresponds to the delay caused by the Force Majeure event. An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the

24

time for performance of any other obligation. The United States will notify TEC in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

47.    If the United States does not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, the United States will notify TEC in writing of its decision within 15 Days of receipt of the explanation and description required by Paragraph 45.

48.    If TEC elects to invoke the dispute resolution procedures set forth in Section XIII (Dispute Resolution), it shall do so no later than 30 Days after receipt of the United States' notice under Paragraph 47. In any such proceeding, TEC shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that TEC complied with the requirements of Paragraphs 44 and 45. If TEC carries this burden, the delay at issue shall be deemed not to be a violation by TEC of the affected obligation of this Consent Decree identified to the United States.

## XIII.    DISPUTE RESOLUTION

49.    <u>Exclusivity of Remedy</u>. Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under this Consent Decree. A Party's failure to seek resolution of a dispute under this Section shall preclude it from raising any such issue as a defense to an action by the other Party to enforce any obligation arising under this Consent Decree. For the purposes of this Section XIII only, TEC Affiliated Entities Phyllis M. Taylor, William W. Pecue II, Dina Bracci Riviere, and Endeavor Enterprises LLC will each be considered a Party with respect to

the commitments in Section VI and other obligations specifically applicable to TEC Affiliated Entities.

50.    <u>Informal Dispute Resolution</u>. If any Party determines that there is a dispute subject to the Dispute Resolution provisions of this Consent Decree, that Party shall send a written notice of dispute to all other Parties outlining the nature of the dispute and requesting informal negotiations to resolve the dispute. The Parties shall endeavor to resolve the dispute through good faith negotiations, but if the Parties cannot resolve a dispute by informal negotiations, then the position advanced by the United States, after consultation with the State, shall be considered binding unless TEC invokes formal dispute resolution procedures as set forth below.

51.    <u>Formal Dispute Resolution</u>.

a.    To invoke formal dispute resolution, TEC shall, within 10 Days after the conclusion of informal dispute resolution, serve on the United States and the State a written Statement of Position regarding the matter in dispute. The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting TEC's position and any supporting documentation relied upon by TEC.

b.    The United States, after consultation with the State, shall serve its Statement of Position within 20 Days of receipt of TEC's Statement of Position. The United States' Statement of Position shall include, but is not limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States.

c.    The United States' Statement of Position shall be binding on TEC unless TEC files a motion for judicial review of the dispute in accordance with the following Paragraph.

26

52.     <u>Judicial Review</u>. TEC may seek judicial review of the dispute by filing with the Court and serving on the United States and the State in accordance with Section XXII of this Consent Decree, a motion requesting judicial resolution of the dispute.

53.     TEC's motion must be filed within 20 Days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph. The motion shall contain a written statement of TEC's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of this Consent Decree.

54.     The United States and the State shall respond to TEC's motion within the time period allowed by the Local Rules of this Court.

55.     <u>Burden of Proof</u>. Except as otherwise provided herein, TEC shall bear the burden of demonstrating by a preponderance of the evidence that its position complies with this Consent Decree. With respect to disputes arising under Paragraphs 10 or 11 only, TEC shall bear the burden of establishing that the position of the United States is arbitrary and capricious or otherwise not in accordance with law. With respect to disputes arising under Section XIV, including the application of any defined terms for purposes of Section XIV, the burden of proof shall be in accordance with applicable principles of law.

56.     <u>No Effect on Deadlines</u>. The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of TEC under this Consent Decree, unless and until final resolution of the dispute so provides. Nothing in this paragraph shall preclude TEC from moving the District Court for a stay of such obligations.

XIV.   COVENANTS NOT TO SUE OR ASSERT CLAIMS AND RESERVATIONS

57.   <u>United States' Covenants Not to Sue or Assert Claims Against TEC and Its</u> <u>Affiliated Entities</u>. Subject only to the conditions and reservations of rights set forth in Paragraphs 61 and 63, the United States covenants not to sue or assert against TEC or any of its Affiliated Entities any civil or administrative claims (including but not limited to contingent or unliquidated civil or administrative claims), actions, or orders arising from or relating to the MC-20 Incident, the MC-20 Facility, or the MC-20 Site, including claims for NRD and claims relating to any activities or physical alterations at the MC-20 Facility or MC-20 Site made by or at the direction of the United States in response to the MC-20 Incident, under (a) OPA; (b) CWA; (c) OCSLA; (d) the Endangered Species Act § 11(a)(1), 16 U.S.C. § 1540(a)(1); (e) the Marine Mammal Protection Act 16 U.S.C §§ 1361 *et seq*.; (f) the National Marine Sanctuaries Act § 306(1), 16 U.S.C. § 1436(1); (g) the Federal Oil and Gas Royalty Management Act, 30 U.S.C. § 1719(a); (h) the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C §§ 9601 *et seq*.; (i) the Clean Air Act, 42 U.S.C. §§ 7401 *et seq*.; (j) Emergency Planning and Community Right-to-Know Act, 42 U.S.C. §§ 11001 *et seq*.; (k) any claims asserted by the United States in Case No. 20-cv-2910 (E.D. La.); or (l) any other statute, regulation, or cause of action for civil damages or civil penalties that the Environment and Natural Resources Division has actual and present authority to assert and compromise pursuant to 28 C.F.R. § 0.65.

58.   <u>State of Louisiana's Covenants Not to Sue or Assert Claims Against TEC and Its</u> <u>Affiliated Entities.</u> Subject only to the conditions and reservations of rights set forth in Paragraphs 61 and 63, the State covenants not to sue or assert against TEC or any of its Affiliated Entities any civil or administrative claims (including but not limited to contingent

and/or unliquidated civil or administrative claims), actions, or orders arising from or relating to the MC-20 Incident, the MC-20 Facility, or the MC-20 Site, including claims relating to any activities or physical alterations at the MC-20 Facility or MC-20 Site made by or at the direction of the United States in response to the MC-20 Incident, under (a) OPA; (b) OSPRA; or (c) any other statute, regulation, or cause of action for civil damages or civil penalties that the State has actual and present authority to assert and compromise.

59.    The covenants not to sue or assert claims by the United States and the State in Paragraphs 57 and 58, respectively, are explicitly conditioned on (1) complete performance by TEC of its obligations under this Consent Decree, and (2) the material accuracy of the information provided by TEC at the request of the United States regarding TEC's financial condition. Assuming material accuracy, the United States acknowledges that the financial information provided by TEC is sufficient to assess TEC's financial condition for the purposes of this settlement.

60.    As of the Effective Date, all pending administrative orders issued by a U.S. agency to TEC relating to the MC-20 Facility, the MC-20 Incident, or the MC-20 Site (with the exception of the order at issue in IBLA No. 2021-14, which will be vacated under Paragraph 7) are vacated.

61.    <u>Reservations of Rights by the United States and State</u>. Notwithstanding any other provision this Consent Decree, the United States and the State reserve all claims not expressly covered by the covenants not to sue or assert claims set forth above, including the following claims against TEC or any TEC Affiliated Entities:

        a.    Claims based on a failure to meet a requirement of the Consent Decree;

        b.    Claims based on past, present, or future discharges or releases of oil or a

hazardous substance unrelated to the MC-20 Incident, the MC-20 Facility, or the MC-20 Site as addressed in Paragraphs 57 and 58;

c.      Claims based on any violation of Federal or State law that occurs after the date of lodging of the Consent Decree, other than a discharge of oil from the MC-20 Facility or the MC-20 Site; and

d.      Any claim of criminal liability.

62.      <u>Covenants not to sue or assert claims by TEC and its Affiliated Entities</u>. TEC and its Affiliated Entities covenant not to sue the United States (including its officers, employees, or contractors) or the State with respect to any claim or defense that any of them has asserted in Case No. 20-cv-2910 (E.D. La.) and any other claims asserted or that could be asserted by TEC or any Affiliated Entity against the United States arising from the MC-20 Incident, or relating to the MC-20 Facility or MC-20 Site, including (a) claims relating to any activities or physical alterations at the MC-20 Facility or MC-20 Site made by or at the direction of the United States in response to the MC-20 Incident, and (b) any such claims against the OSLTF or before the Interior Board of Land Appeals; provided however that this covenant shall not apply to claims based on a failure by the United States or the State to meet a requirement of the Consent Decree.

63.      This Consent Decree does not limit or affect the rights of TEC, TEC Affiliated Entities, the United States, or the State against any third parties, not party to this Consent Decree.

64.      Other than TEC's Affiliated Entities, this Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party not party to this Consent Decree.

## XV.    COSTS

65.      The Parties shall bear their own costs of this action, including attorneys' fees.

30

## XVI.    NOTICES

66.      Unless otherwise specified in this Consent Decree, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and sent by mail or email, with a preference for email, addressed as follows:

| | |
|---|---|
| As to DOJ by email (preferred): | eescdcopy.enrd@usdoj.gov<br>Re: DJ #90-5-1-1-11008/2 |
| As to DOJ by mail: | EES Case Management Unit<br>Environment and Natural Resources Division<br>U.S. Department of Justice<br>P.O. Box 7611<br>Washington, D.C. 20044-7611<br>Re: DJ# 90-5-1-1-11008/2 |
| As to USCG by email: | brian.judge@uscg.mil<br>Thomas.H.VanHorn@uscg.mil |
| As to DOI by email: | eric.andreas@sol.doi.gov |
| As to DOI by mail: | Eric Andreas<br>U.S. Department of the Interior<br>MS-5358<br>1849 C Street, NW<br>Washington, DC 20240 |
| As to NOAA by email: | chauncey.kelly@noaa.gov |
| As to NOAA by mail: | Chauncey Kelly<br>Section Chief<br>National Oceanic and Atmospheric Administration<br>Office of the General Counsel<br>Natural Resources Section<br>1315 East-West Highway<br>SSMC3, Suite 15107<br>Silver Spring, MD 20910 |

As to the State by email:        kelli.braud@la.gov

As to the State by mail:        Kelli Braud, Attorney
Louisiana Oil Spill Coordinator's Office, on behalf
of the State Trustees
7979 Independence Blvd., Suite 104
Baton Rouge, LA 70806

As to TEC:        William Pecue
President
Taylor Energy Company LLC
One Lee Circle
New Orleans, Louisiana 70130
wpecue@taylorenergy.com

with a copy to:

Carl D. Rosenblum
Jones Walker LLP
201 St. Charles Ave
New Orleans, LA 70170-5100
crosenblum@joneswalker.com

and

Paul J. Goodwine
Looper Goodwine PC
650 Poydras Street, Suite 2400
New Orleans, Louisiana 70130
pgoodwine@loopergoodwine.com

and (for notices pertaining to Paragraphs 22-28)
(TEC information sharing cooperation)

Denise Mustin
Taylor Energy Company LLC
One Lee Circle
New Orleans, Louisiana 70130
dmustin@taylorenergy.com

32

As to Endeavor Enterprises L.L.C.:  William Pecue
President
Endeavor Enterprises L.L.C.
One Lee Circle
New Orleans, Louisiana 70130
wpecue@taylorenergy.com

As to William W. Pecue II:  William Pecue
One Lee Circle
New Orleans, Louisiana 70130
wpecue@taylorenergy.com

As to Phyllis M. Taylor:  Phyllis M. Taylor
One Lee Circle
New Orleans, Louisiana 70130
pmtaylor@taylorenergy.com

As to Dina Bracci Riviere:  Dina Bracci Riviere
One Lee Circle
New Orleans, Louisiana 70130
driviereCFO@taylorenergy.com

67.     Any Party may, by written notice to the other Parties, change its designated notice recipient or notice address provided above.

68.     Notices submitted pursuant to this Section shall be deemed submitted upon mailing or transmission by email, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## XVII.  EFFECTIVE DATE

69.     The Effective Date of this Consent Decree is the 31st day after entry on the docket of the District Court's approval of the Consent Decree (or the day after the expiration of any Court-ordered extension of the time to appeal, whichever is later) unless an appeal is timely filed. In the event of a timely appeal, the Consent Decree will become effective when the District Court's approval of the Consent Decree is final and not subject to further appeal.

33

## XVIII. RETENTION OF JURISDICTION

70.    The Court shall retain jurisdiction over this case and the Parties until termination of this Consent Decree, without objection of the Parties, for the purpose of resolving disputes brought by any Party arising under this Consent Decree or entering orders modifying this Consent Decree, pursuant to Sections XIII and XIX, or effectuating or enforcing compliance with the terms of this Consent Decree.

## XIX.    MODIFICATION

71.    Except as expressly provided herein, terms of this Consent Decree, including any attached appendices, may be modified only by a subsequent written agreement signed by all the Parties. Where the modification constitutes a material change to this Consent Decree, it shall be effective only upon approval by the District Court.

72.    Any disputes concerning modification of this Consent Decree shall be resolved pursuant to Section XIII (Dispute Resolution), provided, however, that, instead of the burden of proof provided by Paragraph 52, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XX.    TERMINATION

73.    This Consent Decree may be terminated when: (a) the United States determines that TEC has satisfactorily completed performance of all of its obligations required by this Consent Decree, including all payments required under Sections VIII, X, and XI; and (b) TEC has received the final liquidation of the company by Louisiana state court order. In such event, the United States may file a motion, reciting that the requirements of the Consent Decree have been met and requesting termination of the Consent Decree.

34

74.    TEC's and TEC's Affiliated Entities' obligations under Paragraph 20, the United States', TEC's, and TEC's Affiliated Entities' obligations under Section VI, and the covenants not to sue or assert claims under Section XIV shall survive termination of the Consent Decree.

## XXI.    PUBLIC PARTICIPATION

75.    This Consent Decree shall be lodged with the District Court for a period of not less than 40 Days for public notice and comment in accordance with 28 C.F.R. § 50.7. The United States and the State reserve the right to withdraw or withhold their consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate. TEC consents to entry of this Consent Decree without further notice and agrees not to withdraw from or oppose entry of this Consent Decree by the Court or to challenge any provision of the Consent Decree, unless the United States or the State has notified TEC in writing that it no longer supports entry of the Consent Decree.

## XXII.    SIGNATORIES/SERVICE

76.    Each undersigned representative of TEC, the Assistant Attorney General for DOJ ENRD identified on the DOJ signature page below, and the undersigned representatives of the State, certifies that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this Consent Decree.

77.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis. TEC agrees to accept service of process by mail (including email) with respect to all matters arising under or relating to this Consent Decree and to waive the formal

35

service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any

applicable Local Rules of this Court including, but not limited to, service of a summons.

## XXIII. INTEGRATION

78.     Except as provided in Paragraph 30, this Consent Decree constitutes the entire

agreement among the Parties regarding the subject matter of the Consent Decree and supersedes

all prior representations, agreements and understandings, whether oral or written, concerning the

subject matter of the Consent Decree herein.

## XXIV. FINAL JUDGMENT

79.     Upon approval and entry of this Consent Decree by the District Court, this

Consent Decree shall constitute a final judgment of the District Court as to the United States, the

State, and TEC. The Court finds that there is no just reason for delay and therefore enters this

judgment as a final judgment under Fed. R. Civ. P. 54 and 58.

## XXV.  APPENDICES

80.     The following Appendices are attached to and are part of this Consent Decree:

> "Appendix 1" contains the letter to the trustee of the Decommissioning Trust.

> "Appendix 2" contains a list of documents and information subject to the document transfer provisions in Section VII.

> "Appendix 3" contains the list of TEC Contractors.

> "Appendix 4" contains the form TEC authorization and waiver letter.

Dated and entered this __ day of _____, 20__

_____
UNITED STATES DISTRICT JUDGE

36

**THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of** *United States of America v. Taylor Energy Company LLC*, **Case No. 20-cv-2910:**

12-21-21
_____
Date

**FOR THE UNITED STATES OF AMERICA:**

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
U.S. Department of Justice

R. Shea Diaz, Trial Attorney
William D. Brighton, Section Counsel
Richard Gladstein, Senior Counsel
Scott Cernich, Senior Counsel
Mark Elmer, Senior Counsel
Nick McDaniel, Trial Attorney
Samantha Ricci, Trial Attorney
Environmental Enforcement Section

Reade Wilson, Trial Attorney
Land Acquisition Section

Brian Lynk, Trial Attorney
Elliot Higgins, Trial Attorney
Environmental Defense Section

Environment and Natural Resources Division
U.S. Department of Justice
Washington, DC 20044-7611

DUANE A. EVANS
United States Attorney
Eastern District of Louisiana

*/s/ Peter M. Mansfield*
_____
Peter M. Mansfield
Assistant United States Attorney
Chief of Civil Division
Office of the United States Attorney
650 Poydras Street, Suite 1600
New Orleans, LA 70130

**THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of** *United States of America v. Taylor Energy Company LLC*, **Case No. 20-cv-2910:**

 

**FOR THE STATE OF LOUISIANA:**

___12/17/2021_____
Date

JEFF LANDRY
ATTORNEY GENERAL
STATE OF LOUISIANA

_____
Ryan M. Seidemann, Ph.D.
Assistant Attorney General
Lands & Natural Resources Section/Civil Division
Louisiana Department of Justice
State of Louisiana

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America v. Taylor Energy Company LLC*, Case No. 20-cv-2910:

LOUISIANA OIL SPILL COORDINATOR'S OFFICE,
DEPARTMENT OF PUBLIC SAFETY

Name:  Samuel E. Jones
Title:  Louisiana Oil Spill Coordinator
Date:  December 14, 2021

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America v. Taylor Energy Company LLC*, Case No. 20-cv-2910:


COASTAL PROTECTION AND RESTORATION AUTHORITY

Name: Kyle R. "Chip" Kline, Jr.
Title: Chairman

Date: 12/21/2021

**THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of** *United States of America v. Taylor Energy Company LLC*, **Case No. 20-cv-2910:**

LOUISIANA DEPARTMENT OF ENVIRONMENTAL QUALITY

Name:  Chuck Carr Brown, PhD.
Title:  Secretary

Date:  12/21/2021

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America v. Taylor Energy Company LLC*, Case No. 20-cv-2910:

**LOUISIANA DEPARTMENT OF NATURAL RESOURCES**

Name:  Thomas F. Harris
Title:  Secretary

Date:  *12 - 21 - 2021*

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America v. Taylor Energy Company LLC*, Case No. 20-cv-2910:

LOUISIANA DEPARTMENT OF WILDLIFE AND FISHERIES

Name: Jack Montoucet
Title: Secretary

Date: 12/21/2021

**THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of** *United States of America v. Taylor Energy Company LLC*, **Case No. 20-cv-2910:**

FOR TAYLOR ENERGY COMPANY LLC:

12/21/2021
Date

William W. Pecue II
President
Taylor Energy Company LLC
One Lee Circle
New Orleans, LA 70130

**THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America v. Taylor Energy Company LLC*, Case No. 20-cv-2910:**

**TEC Affiliated Entity**

**FOR ENDEAVOR ENTERPRISES L.L.C.:**

12/21/2021
Date

William W. Pecue II
President
Endeavor Enterprises L.L.C.
One Lee Circle
New Orleans, LA 70130

**TEC Affiliated Entity**

**IN HIS PERSONAL CAPACITY:**

12/21/2021
Date

William W. Pecue II

**THE UNDERSIGNED PARTY** enters into this Consent Decree in the matter of *United States of America v. Taylor Energy Company LLC*, Case No. 20-cv-2910:

**TEC Affiliated Entity**

**IN HER PERSONAL CAPACITY:**

12/21/2021
Date

Dina Bracci Riviere

THE UNDERSIGNED PARTY enters into this Consent Decree in the matter of *United States of America v. Taylor Energy Company LLC*, Case No. 20-cv-2910:

TEC Affiliated Entity

IN HER PERSONAL CAPACITY:

12/21/2021
Date

Phyllis M. Taylor

Appendix 1 to Consent Decree in *United States v. Taylor Energy Company LLC*

_____ __, 2022

*VIA FEDEX OVERNIGHT*

JP Morgan Chase Bank, N.A.
707 Travis Street, 11th Floor
Houston, Texas 77002

Attn:   Mr. David Wallace, Executive Director,
        As successor to Carol H. Rusciano

Dear Mr. Wallace:

Reference is made to that March 19, 2008 Trust Agreement (Trust Agreement) entered into by and among JP Morgan Chase Bank, N.A. as Trustee, Taylor Energy Company LLC (Taylor Energy) as Settlor, and the United States of America (United States), acting by and through the Minerals Management Service (since reorganized as the Bureau of Ocean Energy Management (BOEM) and the Bureau of Safety and Environmental Enforcement (BSEE)) of the United States Department of the Interior (DOI), as Beneficiary.  Capitalized terms not otherwise defined in this letter shall have the meaning ascribed to them in the Trust Agreement.

In accordance with Section 6.8(a) of the Trust Agreement, Taylor Energy and the United States have mutually agreed to terminate the Trust Agreement and to close the Trust Account and, pursuant to Section 6.8(a), this letter constitutes written evidence of such agreement.   In conjunction with such termination, Taylor Energy and the United States have further agreed that: (i) the remaining principal balance of the Trust Account in the amount of $432,523,718 will be disbursed to BOEM; and (ii) any accrued interest and investment income will be disbursed to Taylor Energy.  Following such disbursements, the Trust Account should be fully and finally closed.

As such, please consider this a joint request by Taylor Energy and the United States to JP Morgan Chase, as Trustee, to disburse to BOEM, on behalf of the United States, the $432,523,718 principal balance in the Trust Account.  Such disbursement should be made in accordance with the payment information that will be provided separately by the parties.

Please also consider this a joint request by Taylor Energy and the United States to JP Morgan Chase, as Trustee, to disburse to Taylor Energy any interest and investment income that has accrued or will accrue prior to disbursement of the principal balance of the Trust Account to BOEM under the foregoing paragraph.  Such disbursement to Taylor Energy should be made in accordance with the usual quarterly interest transfer instructions from Taylor Energy.

Appendix 1 to Consent Decree in *United States v. Taylor Energy Company LLC*

We greatly appreciate your assistance.

Sincerely,


[TEC authorized representative]


[DOI authorized representative]

Appendix 2 to Consent Decree in *United States v. Taylor Energy Company LLC*

**Documents and Information Subject to Section VII of the Consent Decree**

[Cross-reference to Appendix 3 – TEC Contractors that may possess category information (where applicable)]

1.  All on-lease surveys conducted on the MC-20 lease pre- and post-2004. [1]

2.  All directional data for all MC-20 "A" platform wells and intervention wells. [12, 13, 27, 28]

3.  All well files for each well on MC-20 "A" platform including documentation of all well work done on each well. [11]

4.  All existing well fluid samples for all wells on MC-20 "A" platform. [9]

5.  Last well test data for each well on MC-20 "A" platform.

6.  IADC reports for all MC-20 "A" platform wells dating back to original spud.

7.  IADC reports for all intervention wells. [29]

8.  Latest well bore schematics for all MC-20 "A" platform wells, including all tubing installed plugs, valves and gas lift valves. [11]

9.  Last test results for all plugs and valves in all wells on MC-20 "A" platform. [11]

10. All records of casing pressure on all wells on MC-20 "A" platform.

11. Any reports associated with underground flow while drilling any well on MC-20 "A" platform.

12. Documentation of wellhead equipment, including tree valve equipment that existed pre-2004 event.

13. All reports containing reservoir analysis and performance. [30, 31, 11]

14. Fugro Assessment of Seafloor Movements at MC-20. Fugro Report #0201-5381-1 and supporting raw data. [1]

15. Fugro Bathymetric, Side Scan Sonar, Sub-Bottom Profiler, and Magnetometer Survey. Fugro Report #0201-5381-1 and supporting raw data. [1, 25]

16. Fugro Geotechnical Investigation. Fugro Report #0201-5381-2 and supporting raw data. Two Soil Borings (B1, 82) two downhole vane borings, four Halibut vane tests. [1, 25]

17. All Oceaneering ROV Bottom Survey(s) Reports and supporting raw data on or around the MC-20 Facility or MC-20 Site. [2]

18. Fugro Seafloor Failure Analysis. Fugro Report #0201-5381-7 and supporting raw data. [1, 25]

19. C&C Side Scan Sonar Survey Report and supporting raw data. [3, 25]

20. Fugro Survey on Soil Conditions. Fugro Report #0201-6235-01 and supporting raw data. Soil borings and 5 near seafloor in situ Halibut vane tests. [1, 25]

21. Come Monday (Weatherford) Plume/Sediment Sampling survey - report dated Jan. 30, 2008 and supporting raw data. [5, 25]

Appendix 2 to Consent Decree in *United States v. Taylor Energy Company LLC*

**Documents and Information Subject to Section VII of the Consent Decree**

22.    Chemical Characterization of Sediment and Water Samples at MC-20 by NewFields Environmental Forensics Report dated March 5, 2008 and supporting raw data. Samples collected during Come Monday Survey. [15, 25]

23.    Fugro report on Stability Analysis for MC-20 and supporting raw data. [1, 25]

24.    Fugro Shallow Hazard Survey on MC-20. Fugro Report #2408-1073 and supporting raw data. [1]

25.    C&C Technologies Side Scan Sonar (repeat) Survey Report and supporting raw data. [3, 25]

26.    Reports and supporting raw data from Fugro box core and gravity piston core sampling program. (at least three different sheen samples are captured on 7/22/12; 7/23/12; 7/24/12). [1, 9, 25]

27.    Reports and supporting raw data from Fugro towed side scan survey on 2-0 grid pattern targeting well bay area and northwest side of jacket and Fugro sub-bottom profiler survey. [1, 25]

28.    Reports and supporting raw data from 2015 C&C Technologies towed sonar survey: multibeam, side scan, and sub-bottom profiler over areas of previous 2006 and 2010 surveys. [3, 25]

29.    Reports and supporting raw data from 2015 Fugro and Bibby Subsea ROV-mounted Echoscope Survey and Halibut Vane Geotech Soil Analysis at Dome C site. [1, 25]

30.    Reports and supporting raw data from 2018 Fugro AUV Survey - Multibeam Sonar and Sub Bottom Profiler. [1, 25]

31.    GC x GC data and interpretive results from all environmental samples, including but not limited to oil, gas, raw gas, sediment, soil, or water samples from, or related to, the MC-20 Facility, MC-20 Site, or MC-20 Incident. [6, 7, 8]

32.    All data, analytical results, and reports derived from or related to any biological samples collected from or related to the MC-20 Facility, MC-20 Site, or MC-20 Incident. [15]

33.    All data, analytical results, and reports supporting the TEC "rum punch" analyses.  [5]

34.    All video and photos recorded during excursions to site, including but not limited to video and photos recorded by divers, ROVs, or AUVs. [16, 17, 18, 19, 20, 21, 22, 23, 24]

35.    Physical environmental samples, including but not limited to oil, gas, raw gas, sediment, soil, or water samples, from, or related to, the MC-20 Facility, MC-20 Site, or MC-20 Incident, and all data, analytical results, and reports derived from or related to such samples. Data includes raw data, metadata, and QA/QC data. [15, 5, 6, 7, 8, 9]

Appendix 3 to Consent Decree in *United States v. Taylor Energy Company LLC*

## TEC Contractors

1.   Fugro Chance Inc., Fugro-McClelland Marine Geosciences, Inc., Fugro GeoServices, Inc., and Fugro Geos, Inc.

2.   Oceaneering International, Inc.

3.   C&C Technologies, Inc.

4.   Weatherford International, Inc.

5.   Rich Camilli and Navistry Corporation

6.   Edward Overton and Louisiana State University

7.   Christopher Reddy and Makepeace Environmental Solutions LLC

8.   David Valentine and Valentine Scientific & Consulting Services, Inc.

9.   Wade Bryant and C-K Associates, LLC

10.   Southern Seaplane, Inc.

11.   Boots & Coots Services, LLC (Halliburton)

12.   Wild Well Control, Inc.

13.   Halliburton Energy Services, Inc.

14.   GEODynamics, Inc.

15.   Waldemar S. Nelson and Company, Inc.

16.   Global Industries Offshore, LLC

17.   Epic Diving & Marine Services, LLC

18.   Ranger Offshore, Inc.

19.   Chet Morrison Contractors, L.L.C.

20.   C-Innovation, L.L.C.

21.   Bordelon Marine, Inc.

22.   SeaTrepid International, LLC

23.   SeaROV Services LLC

24.   Versabuild, LLC

25.   Geoscience Earth & Marine Services (GEMS)

26.   Alpha Analytical

27.   Schlumberger

28.   Helmer Directional Drilling

29.   Diamond Offshore Company

30.   Williams M. Cobb & Associates, Inc.

Appendix 3 to Consent Decree in *United States v. Taylor Energy Company LLC*

**TEC Contractors**

31.    Platt, Sparks & Associates

Appendix 4 to Consent Decree in *United States v. Taylor Energy Company LLC*

[TEC LETTERHEAD]

[DATE]

**URGENT – REQUIRES IMMEDIATE ATTENTION**

Re: MC-20 Contractor Information and/or Documents

Dear _____:

Taylor Energy Company LLC ("TEC"), the United States of America (the "United States"), and the State of Louisiana (the "State") have negotiated a proposed Consent Decree relating to the MC-20 Incident, MC-20 Facility and MC-20 Site.

Under the terms of the Consent Decree, TEC has agreed to make available to the United States certain information or documents (including electronically stored information ("ESI")) in its possession or unrestricted control related to the MC-20 Facility or the MC-20 Site identified in Appendix 2 to the Consent Decree ("Appendix 2 Documents") (a copy of which is attached hereto), with the exclusion of information or documents subject to confidentiality limitations or restrictions in a master service agreement, independent contractor agreement, or similar contractor agreement. TEC has further agreed to permit the United States to request Appendix 2 Documents directly from you in your capacity as a MC-20 contractor of TEC. We attach the relevant Consent Decree provisions for your ease of reference.

We understand that portions of the Appendix 2 Documents may be considered confidential by either TEC or you, and that subject to confidentiality limitations or restrictions in a master service agreement, independent contractor agreement, or similar agreement, you may be restricted from providing certain Appendix 2 Documents, or portions thereof, to a third party, including the United States.

The purpose of this letter is three-fold:

First, we ask that you please continue to retain all information and documents (including physical samples) in your possession or unrestricted control relating to the MC-20 Facility or the MC-20 Site. Specifically, please preserve all non-identical copies of all documents, records, or other information (including documents, records, or other ESI) in your possession or unrestricted control or that come into your possession or unrestricted control relating to the MC-20 Facility or the MC-20 Site. TEC expressly requests that you retain all such information and documents until the later of: (a) the final liquidation of TEC which, for the avoidance of doubt is upon court order, or (b) two (2) years from the date of this letter. Further, to the extent you have in your possession any physical samples as described in Appendix 2, No. 35, we ask that you provide the United States with a list or catalog of such samples.

Second, TEC hereby requests and authorizes you to make available to the United States any non-privileged Appendix 2 Documents that are requested by the United States, and expressly releases you from any claims that TEC could assert against you relating to the disclosure of the non-privileged information or documents that you choose to make available to the United States. This request and authorization expressly excludes any information or documentation that is subject to the protections of the attorney-client privilege (for the limited purposes of this matter, you may assume that includes all communications with TEC counsel) and/or the attorney work product doctrine, all of which TEC continues to maintain as protected from disclosure and expressly does not waive. TEC, however, does

Appendix 4 to Consent Decree in *United States v. Taylor Energy Company LLC*

not claim any privilege or protection over any data (e.g., environmental sampling data, well test data, pressure readings, photographs, or the like) or any physical sample related to the MC-20 Facility or the MC-20 Site. When producing such information or documentation, you understand that you have released TEC from any responsibility and liability to you for doing so.

Third, as demonstrated by the foregoing, TEC has and will continue to use its best efforts to ensure that no confidential information of its contractors is made available to the United States absent the express consent of such contractor.  However, to the extent that any information or documents that you consider to be confidential are inadvertently disclosed by TEC to the United States, TEC requests that such disclosure not be deemed a breach or default under any master service agreement, independent contractor agreement, non-disclosure agreement, or similar agreement that TEC may have with you.

If you have any questions relative to this letter, please let me know. If you are in agreement with the foregoing, please sign this letter in the space provided and return it to me. Your prompt response within the next two weeks would be appreciated.

Very Truly Yours,


William W. Pecue, II
President, Taylor Energy Company LLC


AGREED and ACCEPTED
This _____ day of _____, 202_.


By:_____
   Signature

Name: _____
PLEASE PRINT
Company: _____
PLEASE PRINT
Title: _____
PLEASE PRINT

Appendix 4 to Consent Decree in *United States v. Taylor Energy Company LLC*

**Appendix         4         (first         attachment)**

Appendix 2 to Consent Decree

Appendix 4 to Consent Decree in *United States v. Taylor Energy Company LLC*

**Appendix 4 (second attachment)**

Consent Decree Excerpts

[Paras. 21-27]